**Eli FRIEDMAN, Individually and on behalf of all Others Similarly Situated, Plaintiffs,**

v.

**RAYOVAC CORPORATION, Thomas H. Lee Partners, Kenneth V. Biller, Kent J. Hussey, David A. Jones, Scott A. Schoen, Stephen P. Shanesy, Thomas R. Shepherd, Randall J. Steward, Warren C. Smith, Jr. and Merrell M. Tomlin,[1] Defendants.**

Nos. 02–C–0308–C, 02–C–325–C, 02–C–370–C.

United States District Court, W.D. Wisconsin.

May 30, 2003.

must receive permission from the court to add or drop a party from the lawsuit, even if defendants have not yet filed an answer. *Ed Miniat, Inc. v. Globe Life Insurance Group, Inc.,* 805 F.2d 732, 736 (7th Cir.1986). Defendants have not objected to the changes that plaintiffs made in their amended complaint. Therefore, I will treat the changes as an implied motion for leave to amend and grant it. I have amended the caption accordingly.

S. Gene Cauley, for Plaintiff.

Donald K. Schott, Quarles & Brady, Madison, WI, James R. Carroll, Skadden, Arps, Slate, Meagher & Flom, Boston, MA, Matthew R. Kipp, Skadden, Arps, Slate, Meagher & Flom, Chicago, IL, for Defendants.

## OPINION AND ORDER

CRABB, District Judge.

In this proposed class action, plaintiffs allege that defendants artificially inflated the price of defendant Rayovac Corporation's stock by making false and misleading statements in violation of the Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, and the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a–78mm. Jurisdiction is present under 28 U.S.C. § 1331. In an opinion and order dated September 23, 2002, I granted plaintiffs' motion to appoint Eli Friedman, Lawrence M. Cox, Carol A. LoGalbo and Harold C. Eck as the lead plaintiff group. On November 12, 2002, I granted plaintiffs' motion to appoint Cauley Geller Bowman & Coates LLP as lead counsel.

Presently before the court are two motions to dismiss: one filed by defendant Thomas H. Lee Partners and one filed by the remaining defendants. In both motions, defendants raise multiple grounds for dismissing all of plaintiffs' claims. I agree with defendant Partners that the statute of limitations has expired for plaintiffs' claims against it under the 1933 Act. Thus, I will dismiss these claims against defendant Partners. I disagree with defendants that the heightened pleading standards of the Private Securities Litigation Reform Act and Fed.R.Civ.P. 9(b) apply to claims brought under §§ 11 and 12(a) of the 1933 Act because those claims do not include fraud as an element. Furthermore, I conclude that plaintiffs have stated a claim under Fed.R.Civ.P. 8 with respect to their claims against defendants Rayovac, Jones, Hussey, Shepherd, Schoen, Smith and Steward under § 11 of the 1933 Act, with respect to all defendants (except defendant Partners) under § 12(a)(2) and with respect to defendants Jones, Hussey, Shepherd, Schoen, Smith, Shanesy, Tomlin, Steward and Biller under § 15 of the 1933 Act.

Turning to plaintiffs' claims under the 1934 Act, I conclude that in some respects, plaintiffs have alleged with sufficient particularity the statements that are allegedly false and misleading, the reasons why the statements are false and misleading and the factual basis for plaintiffs' belief, as required by the 15 U.S.C. § 78u–4(b)(1). However, plaintiffs have failed to allege

sufficient facts to show that any of the defendants made the allegedly false statements, with the exception of defendants Rayovac, Jones and Hussey. Furthermore, plaintiffs have failed to allege particular facts that would create a strong implication that these defendants knew or recklessly disregarded the possibility that the statements were false or misleading, as required by 15 U.S.C. § 78u–4(b)(2). Thus, plaintiffs have failed to state a claim with respect to any of their claims under the 1934 Act. However, rather than dismiss these claims with prejudice, I will allow plaintiffs an opportunity to amend their complaint to attempt to cure the deficiencies detailed in this opinion.

In setting forth the allegations of fact, I have included not only the allegations in plaintiffs' amended complaint but also facts from documents referred to in the complaint and provided by defendants in their motion to dismiss. *See Venture Associates Corp. v. Zenith Data Systems Corp.*, 987 F.2d 429, 431–32 (7th Cir.1993) ("Documents that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim.")

## ALLEGATIONS OF FACT

### A. *Parties*

Lead plaintiffs Eli Friedman, Lawrence M. Cox, Carol A. LoGalbo, Harold C. Eck and the other proposed class members are investors who purchased shares of Rayovac common stock between April 26, 2001, and September 19, 2001. Defendant Rayovac Corporation is a Wisconsin corporation that manufactures batteries. Defendant David A. Jones is chairman of the board and chief executive officer of Rayovac. Defendant Kent J. Hussey is president, director and chief financial officer. Defendant Steven P. Shanesy is executive vice-president of global brand manage-

ment. Defendant Merrell M. Tomlin is executive vice president of sales. Defendant Randall J. Steward is executive vice-president of administration and chief financial officer. Kenneth V. Biller is executive vice-president of operations.

Defendant Thomas H. Lee Partners is a firm located in Massachusetts; it owned approximately 26% of Rayovac's issued and outstanding common stock between April 26, 2001, and September 19, 2001. Defendant Thomas R. Shepherd is a director of Rayovac and special partner of defendant Partners. Defendants Scott A. Schoen and Warren C. Smith are directors of Rayovac and managing partners of defendant Partners.

Each defendant participated directly in the day-to-day operations of Rayovac. Each had access to confidential information about the company's business and operations. Each directly and indirectly controlled the conduct of the company's business, the information contained in its filings with the Securities and Exchange Commission and public statements about its business and financial results.

### B. *Representations Regarding Sales Growth*

From September 1996 until December 2000, defendant Rayovac reported continuous sales growth, increasing from $417.9 million to $675.3 million. However, on December 19, 2000, Rayovac announced that its sales for the current quarter would be lower than anticipated. Rayovac stated that the demand in the previous year had been unusually high because of "Y2K" and an "active storm season." In addition, Rayovac stated that sales were hurt by retailers' reluctance to carry a "normal" inventory.

Consistent with the December 2000 prediction, Rayovac announced on January 25, 2001, that its sales and earnings were down for the first time since 1996. Rayo-

vac's CEO, defendant Jones, stated that although the decrease was expected, "we remain confident that beginning in our second fiscal quarter, Rayovac will return to its history of strong growth."

On April 26, 2001, defendant Rayovac issued a press release announcing results for the second fiscal quarter of 2001. It reported that sales rose 4%, from $140.1 million to $145.2 million as compared to the same quarter in the previous year. In the same press release, defendant Jones stated that Rayovac had achieved "strong growth" in the second quarter and that "the market data suggests that the battery category is returning to its historical annual growth rate of six to seven percent in recent years."

Rayovac held a conference call on the same day of the press release. It began:

This broadcast may include forward-looking statements which are based in part on management's estimates, assumptions, and projections as of today. These statements are subject to certain risks and uncertainties and other factors that can cause results to materially differ from what we currently expect. Actual results may differ due to changes in external competitive market factors, changes in our industry or the economy in general, as well as various other factors including those we discuss today and those discussed in our securities filings, including our most recent annual report on form 10–K. We assume no obligations to update these statements.

During the conference call, defendant Jones stated again that "the market continues to rebound and is quickly returning to its strong historical growth trends." With regard to Rayovac's performance outside the United States, defendant Jones stated:

Around the world, retailers are experiencing strong battery growth as a result of adding Rayovac high performance value array and products to their assortments. Our strategy is not only working, but also gaining significant momentum in all important geographic regions. And we expect more major wins to come our way in the near future. After all, why wouldn't every retailer carry Rayovac, the fastest growing battery company in the world? Overall, we are very encouraged that industry growth trends are returning in virtually all important segments of the battery industry and Rayovac continues to outperform the market in all key segments.

Next, defendant Jones discussed the company's future performance:

Rayovac's long-term top line sales growth should be in the 8–9% range, outperforming the overall industry growth rates of 6–7%. Gross margins and operating margins should continue to improve 50–100 basis points annually in the future. We confirm our previous fiscal year ending 9/30/01 guidance from $1.30 to $1.32 cents earnings per share. Our guidance for calendar year '01 would be in a range of $1.36 to $1.38 EPS. Our preliminary guidance for fiscal year '02 is in a range of $1.50 to $1.55 earnings per share in line with our previously communicated long term EPS growth rate target of 15–18%.

In response to several questions regarding the rate of sales growth, defendant Jones confirmed that "we believe that sales growth over the second half of '01 should be about that 8–9% range and we feel actually pretty comfortable with that number" and that "a good assumption for modeling" during the second half of the year "would be high single digit sales." When asked how inventory positions held by retailers may affect shipments, defendant Jones responded:

[W]e think our inventory position is very good, we are not over inventoried any-

where, having said that we are cautious and with the economic slowdown that has occurred over the last six months retailers have pulled their horns in and they want to make sure that they plan their business appropriately, not just in batteries but in all categories you know we're seeing cautious retailers but I can only talk about inventory at retail is in extremely good shape and we think we have no excess out there.

These statements were made with the understanding and expectation that they would be repeated in analyst reports. On April 26, 2001, H. H. Murren, an analyst at Merrill Lynch issued a report stating:

> We expect [Rayovac] to continue to deliver solid results in F2001 due to increased distribution and market share gains. We expect the battery category overall to return to more normalized levels of growth (up 6–8%) in C2001 post the Y2K comp. We reiterate our Accumulate rating and believe the shares are exceptionally inexpensive trading at 12.4X our C2001E of $1.44.
>
> \* \* \* \* \* \*
>
> We expect [Rayovac's] sales to be up mid/high single digits in F2Q01 (March) due to an expected improvement in the general battery category, new product launches, and increased distribution and market share gains.

On May 14, 2001, defendant Rayovac filed a Form 10–Q (a quarterly financial report) with the Securities and Exchange Commission, which confirmed the previously-announced financial results. The form was signed by defendant Steward.

On July 26, 2001, defendant Rayovac issued a press release announcing its financial results for the third fiscal quarter of 2001, ending June 30, 2001. Defendant Raypvac stated that revenue had risen 6% as compared to the third fiscal quarter of 2000. Defendant Jones commented on these results in the press release:

> The Rayovac brand continues to build momentum in the marketplace as our sales outpaced both our competition as well as the industry as a whole.... Despite a weakened economy and slower than anticipated overall battery category growth, Rayovac continues to gain unit share as more and more consumers recognize the value of our brand.

The Form 10–Q filed on August 9, 2001, confirmed these results. Again, defendant Steward signed the form.

An analyst report from Merrill Lynch responded to these announcement positively, reiterating its "accumulate" rating. An analyst at UBS Warburg wrote in a report that Rayovac "expects an upturn in 4Q from new accounts" and estimated sales growth at 4%–6%. The report gave a Rayovac a "Buy" rating.

At the annual stockholder meeting on July 31, 2001, defendant Hussey, Rayovac's CFO, commented on the value of Rayovac's stock: "We still think the stock is undervalued. We think it should be in the high $20s ... and it will be in six months."

### C. Representations Regarding Distribution

During the conference call following the April 26, 2001 announcement, defendant Jones discussed the company's "significant distribution wins during the quarter," noting gains it had made with respect to Toys R Us, Kmart, UPS and Procter and Gamble. In addition, Jones stated that Rayovac had experienced a 169% increase in distribution in Latin America "with more entities currently on the way." On May 21, 2001, Rayovac issued a press release, announcing that it would begin shipping batteries to Home Depot. Following this announcement, Rayovac stock increased 11% to $24.50. In two Forms 10–Q filed between April 26, 2001, and September 19,

2001, defendant Rayovac attributed its sales growth to gains in distribution.

### D. *Defendants' Sales Practices*

Defendants knew that the statements regarding growth in sales and distribution would be issued or disseminated to the investing public. They also knew that the statements were all false or misleading because demand for Rayovac products was actually in decline. However, defendants hid this fact from investors by giving their customers large incentives to purchase substantially more product than they could use, thus threatening sales for the future, a practice known as "channel stuffing." According to former Rayovac sales representatives, Rayovac "loaded customers with inventory." Rayovac would sell $50,000 worth of product in one quarter to a customer that purchased only $100,000 of product over the course of a year, meaning that the customer would not have a need for any product the following quarter. One former sales person further explained:

> I mean you are jamming product down the throat of your current customers ... they have no place to move this product. Essentially what you are doing is pre-selling the next quarter. That's all fine and dandy, because you put those numbers in the quarter to pump those numbers up, but as a salesperson, you hear what the forecast was for Rayovac as a whole, you kind of sit back and go, how the hell are they going to do that. Let's do it now and worry about that later. This is what steamed a lot of sales managers because all of a sudden, growth that we may have seen from a client, we are not going to see because we just saturated them with a year and a half of product.

Nevertheless, when this occurred, Rayovac would not make adjustments to the following quarter's sales projections, according to a former employee and a sales district manager. Companies regularly pushed to take more inventory included Poco Sales, PSI Protection Services, Bob's Barricades and Grainger.

Instead of adjusting sales projections, defendants Tomlin and Jones directed management to exert pressure on salespeople to generate unrealistic sales forecasts. A former salesperson explained:

> There was a forecasting system that came out in 2000. It was the most godawful complicated thing you ever saw. Every time you sent in a forecast they would fuck with it. They'd massage it. They'd come back and say, "that number's not good enough." Well, okay, you would give them the number that they wanted, which was always an increase. It could be 10, 15, 20% more. You knew you couldn't make it. People just made up the shit. Then, 3 or 4 or 5 days before the end of the quarter, when top management knew they weren't going to make this number, that's when they would go out and make the really big deals, They would go out to the Kmarts, the Walmarts, the Targets. That's how they pumped up the number.

Management would always make salespeople increase their sales forecasts "knowing full well that we're not going to reach it."

In order to induce customers to buy more product than they needed, Rayovac would use incentives such as extended payment terms. According to former employees, Rayovac's normal terms were 30 days. However, at quarter-end Rayovac would extend the time for payment to 60 or 90 days, a practice known as "dating." Rayovac also used generous advertising credits and discounts. Rayovac would sell $100,000 worth of merchandise and give the customer back 10% for advertising or 20% or 25% if the customer would buy a larger volume. A former salesperson stated that Rayovac would provide extended payment terms *and* discounts if the cus-

tomer agreed to purchase "pallet quantities of batteries where that type of inventory would take someone out six months." A former district sales manager stated that the dating and price discounting "were part of every day business." Rayovac used these incentives with both retailers and wholesalers.

Because of these quarter-end incentives, many customers would wait until the end of the quarter to buy. A former employee stated, "It got to the point where Rayovac would do about 60% of the business in the last 2 or 3 weeks of the quarter." Another former employee commented, "[Y]ou know they always work miracles in the last ten or twelve working days. ... We never knew where it came from, but you know, who are we to say it wasn't right."

Salespeople at Rayovac were under "tremendous pressure" to "make the quarter." "There was always a drive to get orders up at the end of the month," one salesperson stated. Another said that it was "inevitable" that at the end of the quarter, "your sales manager would call you up and say— stop travelling, stop spending expense money, hit the phones and it was basically dialing for dollars." One former employee visited the company's Hong Kong office where he saw numerous boxes of batteries. The employee was told that the batteries were there to help make the quarter. At sales meetings, defendant Jones threatened salespeople that the numbers had to be met.

Rayovac's use of channel stuffing to create the appearance of growth became more aggressive over time. One sales person stated, "I don't think anybody had a long term vision about how to get us out of that downward spiral—it was just, what did you do today and what are you going to do tomorrow. You just did what you had to do to make your number today." Rayovac did not say that it would be unable to maintain the same growth rate of past quarters.

In addition, Rayovac was carrying tens of millions of dollars of receivables from customers who were in financial distress and would be unlikely to pay in full. These customers included Kmart, which accounted for 10% of Rayovac's business, Ames Department Stores, Inc. and Phar–Mor, Inc. At one point, Kmart receivables were outstanding six or seven months. Each of these companies filed for bankruptcy between August 20, 2001, and January 22, 2002. Rayovac did not increase its expenses related to uncollected receivables to account for this problem. A former employee stated, "[T]he Kmart thing really angered a lot of people." Defendant Tomlin circulated a memo, telling employees they would not get a bonus check unless they cleaned up "pricing discrepancies." Rayovac failed to write-off its uncollected receivables during the class period. Ultimately, however, Rayovac took a $2.7 million bad debt write-off for uncollected receivables from Ames, Phar–Mor and Western International and increased its bad debt reserves to $16.1 million to account for its problems with Kmart.

Defendants were "hands-on" managers, dealing with the important issues facing Rayovac's business, including the decline in demand for Rayovac product and the increasing accounts receivables. They were regularly updated on current issues at management meetings and were provided access to Rayovac's financial and revenue information if they did not already have it. As Rayovac's chief financial officer, defendant Hussey was responsible for the decision to create adequate allowance for doubtful accounts and he received monthly and quarterly sales reports showing the pattern of the pulling forward of sales. Because of their positions at Rayovac, defendants controlled the contents of

quarterly and annual reports, press releases and presentations to securities analysts.

Rayovac's ability to meet increased sales predictions was of primary importance to defendants and the success of the secondary offering. However, Rayovac knew that demand for its products had declined and that it needed to substantially increase its allowance for uncollected receivables. To insure a successful secondary offering, defendants embarked on a scheme to artificially inflate the price of Rayovac's common stock.

### E. *Registration Statement and Prospectus*

On May 31, 2001, defendant Rayovac issued a press release announcing that it had filed a registration statement with the SEC for a secondary offering that would be completed in June. Rayovac was offering 3,500,000 shares; the remaining defendants were offering a total of 4,000,000 shares. In June 2001, defendant Rayovac filed the final registration statement, which incorporated a prospectus, and commenced the secondary offering. Defendants Jones, Hussey, Steward, Jones, Schoen, Shepherd and Smith each signed the registration statement.

With respect to Rayovac's sales growth, the prospectus stated:

> The success of our business strategy is evidenced by our consistent improvement in operating results over the past five years. From the twelve months ended in September 30, 1996, through the twelve months ended April 1, 2001, we have grown net sales and adjusted income from operations from $417.9 million to $675.3 million and $27.0 million to $83.3 million, respectively. This growth represents an 11.3% and 28.4% compound annual growth rate in net sales and adjusted income from operations, respectively. In addition, adjusted income from operations margins [has] improved 580 basis points, from 6.5% for

the twelve months ended September 30, 1996, to 12.3% for the twelve months ended April 1, 2001.

\* \* \* \* \* \*

The growth in retail sales of general batteries in the U.S. is due largely to (1) popularity and proliferation of battery-powered devices, such as toys, personal digital assistants, digital cameras, camcorders, pocket televisions, remote controls, personal radios, pagers, portable compact disc players and electronic and video games, (2) the miniaturization of battery-powered devices, which has resulted in consumption of a larger number of smaller batteries and (3) increased purchases of multiple-battery packages for household "pantry" inventory. These factors have increased the average household use of batteries from an estimated 23 batteries per year in 1986 to an estimated 44 batteries per year in 2000.

The prospectus also discussed the company's status with respect to retail distribution. It stated that the "mass merchandiser channel, where we have our strongest presence, with 34% of the U.S. market share, is the fastest-growing channel for the general battery category and provides opportunities for continued growth for us through incremental market share gains and the global expansion of new and existing customers." It noted new distribution agreements with Home Depot, Toys R Us and Kingfisher.

With respect to demand for Rayovac products in Latin America, the prospectus stated that Rayovac had made "sizable distribution gains in the region," acquiring 800 new accounts in Argentina, Mexico, Columbia and Venezuela. It added, "We plan to continue our growth in Latin America." The prospectus cautioned that "we are still vulnerable to the effects of currency exchange rate fluctuations." Ac-

cording to a former field salesperson, "[I]t was obvious in 2000 that Rayovac was seeing a decline in its Latin American business" because of outdated manufacturing facilities, poor product quality and channel stuffing.

The prospectus did not disclose how Rayovac had achieved its sales growth and how its sales practices would negatively affect the company's future growth. In addition, it did not disclose the fact that some of the company's largest customers were experiencing severe financial difficulty and carrying large accounts receivable balances with Rayovac. Defendants failed to conduct an investigation to provide reasonable grounds for a belief that the statements in the registration statement and prospectus were true.

By the end of June 2001, defendants had sold 7.5 million shares of common stock for $19.50 a share. Rayovac generated approximately $65,000,000 from the secondary offering; the remaining defendants collected approximately $74,000,000 collectively. Defendant Jones sold 437,000 shares for $8.1 million. Defendant Hussey sold 100,000 shares for $1.85 million. Defendant Schoen sold 15,000 shares for $276,000. Defendant Shepherd sold 7,500 shares for $139,000. Defendant Shanesy sold 75,000 shares for $1.4 million. Defendant Tomlin sold 69,000 shares for $1.3 million. Defendant Biller sold 86,000 shares for $1.6 million. Because of the false and misleading statements of defendants, Rayovac's common stock traded at artificially inflated prices.

### F. *Generally Accepted Accounting Principles*

Although defendants said that Rayovac's financial statements were prepared in accordance with generally accepted accounting principles, this was not true. Under these principles, revenue should not be recognized until it is "realized or realizable" and earned. These conditions are met when assets are exchanged for cash or claims to cash, and when the entity has substantially performed the obligations that entitle it to the benefits represented by the revenue. Profit is "realized" when the collection of the sales price is reasonably assured. Rayovac violated these principles by improperly accelerating revenue at the expense of future sales, shipping to its own warehouses to create fictitious sales and inducing customers to buy product immediately that otherwise would have been sold in later periods.

Under generally accepted accounting principles, an estimated loss from a loss contingency, such as the collection of receivables, should be accrued as a charge to income when it is probable that an asset has been impaired and the amount of loss can be estimated reasonably. In addition, an expense or loss is recognized if it becomes evident that the previously recognized future economic benefits of an asset have been reduced or eliminated. Rayovac violated these principles by failing to timely record expenses for uncollected accounts receivables.

### G. *Fiscal Fourth Quarter Results*

On September 20, 2001, Rayovac issued a press release, announcing that its fiscal fourth quarter results would be affected negatively by a slowdown in battery sales in its United States and Latin American markets. As a result, it estimated, earnings for the quarter would be flat to down slightly from the same period for the previous year. After this announcement, the price of Rayovac common stock fell 23% to $12.74 a share.

On November 6, 2001, Rayovac announced its results for the fourth quarter of fiscal year 2001. It reported that it was taking a charge of $3.5 million for the quarter and $22.3 million for the full fiscal year. In addition, Rayovac's operating expenses increased, in part because of $2.7

million in bad debt write-offs, which did not include the uncollected receivables from Kmart.

On January 15, 2002, an analyst report from Prudential Securities lowered the rating for Rayovac stock from "Buy" to "Hold" because of Rayovac's dependence on Kmart. On January 24, 2002, two days after Kmart declared bankruptcy, Rayovac announced its results for the first quarter of fiscal year 2002. It increased its bad debt reserves to $16.1 million.

On March 27, 2002, Rayovac announced that it would be reclassifying its financial results for 2001 as a result of new accounting procedures. The new figures excluded reimbursed distribution costs, cutting net sales for 2001 by $59.3 million.

Each of the proposed class members purchased shares of Rayovac common stock during the class period at artificially inflated prices, relying on the integrity of the market price and market information. Each has been damaged as a result of defendants' misrepresentations.

## OPINION

Plaintiffs assert violations of §§ 11, 12(a)(2) and 15 of the Securities Act of 1933 and §§ 10(b) and 20(a) of the Securities Exchange Act of 1934. Section 11 of the 1933 Act imposes liability for making false or misleading representations in a registration statement. 15 U.S.C. § 77k. Section 12(a)(2) prohibits the sale of a security through a prospectus that contains false or misleading statements. 15 U.S.C. § 77*l* (a)(2). Section 15 imposes liability on those who "control" persons liable under other provisions of the 1933 Act. 15 U.S.C. § 77*o*. Section 10(b) of the 1934 Act and Rule 10b–5 promulgated thereunder prohibit fraudulent acts in connection with the purchase or sale of a security. 15 U.S.C. § 78j; 17 C.F.R. § 240.10b–5. Section 20 imposes liability on any person who "controls" those liable under other provi-

sions of the 1934 Act. 15 U.S.C. § 78t. Defendants contend that plaintiff has failed to state a claim upon which relief may be granted with respect to each of these provisions.

### A. *Statute of Limitations*

■ Before addressing the sufficiency of plaintiffs' complaint, I must resolve a preliminary question regarding the statute of limitations. Under 15 U.S.C. §§ 77m and 78i(e), parties asserting violations of the Securities Act of 1933 or the Securities Exchange Act of 1934 must bring an action within one year of the date on which they had notice of their claim. *See also Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991) (limitations period of § 78i(e) applies to claims brought pursuant to § 10(b) and Rule 10b–5). Defendant Partners contends and plaintiffs do not deny that they had notice of their claim on September 20, 2001, the day defendant Rayovac announced that its fourth quarter results would be "flat to down slightly." Although plaintiffs filed their complaint in case no. 02–C–308–C on May 31, 2002, they did not add Thomas H. Lee Partners as a defendant until January 9, 2003. Thus, defendant Partners argues, the statute of limitations expired in September 2002, and this action must be dismissed as to it.

In response, plaintiffs point to the recently enacted Sarbanes–Oxley Act of 2002, P.L. 107–204, arguing that the one-year statute of limitations in §§ 77m and 78i(e) no longer applies. Section 804 of the Sarbanes–Oxley Act is entitled "Statute of Limitations for Securities Fraud" and amends 28 U.S.C. § 1658 to state that a plaintiff has *two* years from the date of discovering the violation in which to bring a claim under the 1934 Act. Although the Sarbanes–Oxley Act did not expressly repeal the limitations period in § 78i(e), to

the extent that the two statutes conflict, the more recent statute would control. *Watt v. Alaska*, 451 U.S. 259, 266, 101 S.Ct. 1673, 68 L.Ed.2d 80 (1981).

However, on its face, the new act does not apply to claims brought under the 1933 Act. Thus, the one-year statute of limitations in § 77m still applies, which plaintiffs missed by more than three months with respect to defendant Partners. Accordingly, plaintiffs claims against defendant Partners under the 1933 Act must be dismissed.

■ The next question is whether the one-year limitation of § 78i(e) still applies. Defendant Partners contends that it does because that was the law in effect at the time the alleged violations occurred. The Sarbanes–Oxley Act was enacted on July 31, 2002; the alleged violations occurred between April 26, 2001, and September 19, 2001. Relying on *Landgraf v. USI Film Products*, 511 U.S. 244, 265, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994), defendant Partners contends that the longer statute of limitations in the new act should not be applied retroactively. In *Landgraf*, the Court recognized the "deeply rooted" presumption against retroactive legislation, reasoning that "individuals should have an opportunity to know what the law is and to conform their conduct accordingly." *Id.* at 265, 114 S.Ct. 1483. Of course, this concern does not necessarily apply to statutes of limitations, which are grounded in concerns of repose, not notice. It would be difficult for defendant Partners to argue that it would have acted differently in 2001 if it had known that Congress was going to extend the limitations period for securities fraud actions.

■ Even assuming that the presumption against retroactive legislation applies to a statute of limitations, this would not necessarily mean that the former limitations period would apply. When Congress has "expressly prescribed the statute's proper reach" to include conduct that occurred before the enactment, the court should apply the statute as prescribed. *Landgraf*, 511 U.S. at 280, 114 S.Ct. 1483. Section 804(b) of the act provides that the new limitations period "shall apply to all proceedings addressed by this section that are commenced on or after the date of enactment of this Act." This provision makes clear Congress's intent to permit application of the new statute of limitations to some conduct that occurred before the statute was enacted on July 31, 2002. The date the conduct occurred is irrelevant; it is the date that the "proceedings" commenced that is determinative.

■ All three of the cases consolidated in this action were filed before July 31, 2002 and are therefore not proceedings "commenced on or after the date of enactment of this Act." However, plaintiffs did not amend their complaint to include defendant Partners until January 2003. Thus, the "proceedings" *against defendant Partners* commenced after the effective date of the act. Seeking to avoid the longer limitations period, defendant Partners contends that "proceedings" should be interpreted to include only the date the lawsuit was filed and not subsequent amendments to the complaint adding new parties, but its view is inconsistent with the Federal Rules of Civil Procedure and with common sense. Under Fed.R.Civ.P. 3, "[a] civil action is commenced by filing a complaint with the court." However, under Rule 15(c), a new party may not be added to the complaint after the statute of limitations has expired except in very limited circumstances. Specifically, the plaintiff must show that the amended complaint "relates back" to the initial complaint, as if the new party had been in the case all along. *Worthington v. Wilson*, 8 F.3d 1253 (7th Cir.1993). This suggests that serving an additional party with a com-

plaint commences a new "proceeding," even if the new claim is part of a lawsuit that was filed previously; otherwise, there would be no statute of limitations problem because the date of the original filing would always control. Defendant Partners cannot argue successfully that January 2003 is the date that the proceedings commenced against it for the purpose of the statute of limitations under the 1933 Act, but that May 2002 is the date proceedings commenced for the purpose of determining the application of the longer limitations period in the Sarbanes–Oxley Act.

Furthermore, as plaintiffs point out, they could have filed a separate action against defendant Partners in January 2003, in which case there could be no dispute over the application of the new statute of limitations. It would make little sense to create a rule encouraging judicial inefficiency by requiring separate lawsuits for claims against different defendants arising out of the same conduct. The two-year limitations period of the Sarbanes–Oxley Act applies to plaintiffs' claims against defendant Partners under the 1934 Act; these claims are not barred by the statute of limitations.

### B. *Securities Act of 1933*

There are two initial disputes regarding plaintiffs' claims under the 1933 Act. First, defendant Partners contends that because lead plaintiffs allege that they purchased their securities on the open market rather than directly through the offering, they lack standing to assert claims under § 12(a)(2) and, therefore, those claims must be dismissed. Second, the parties dispute whether the court should apply the same standard in evaluating the sufficiency of plaintiffs' allegations under the 1933 Act and the 1934 Act.

### 1. *Standing*

In support of its argument that plaintiffs lack standing under § 12(a)(2),

defendant Partners cites *Gustafson v. Alloyd Co.,* 513 U.S. 561, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995). In *Gustafson,* 513 U.S. at 584, 115 S.Ct. 1061, the Court interpreted the word "prospectus" in § 12(a)(2) to mean "a document that describes a public offering of securities by an issuer or controlling shareholder." Therefore, the Court concluded, shareholders who purchased securities in a "private, secondary transaction" (that is, on the open market) could not obtain relief under § 12(a)(2). *Id.* at 564, 115 S.Ct. 1061.

Plaintiffs do not deny that lead plaintiffs purchased shares of Rayovac stock in a "private, secondary transaction." However, they argue persuasively that this issue is not about the sufficiency of the complaint but about the adequacy of lead plaintiffs to serve as class representatives under Fed.R.Civ.P. 23. Defendants cannot deny that some members of the class purchased shares directly in the offering. The proposed class includes everyone who purchased Rayovac shares between April 26, 2001, and September 19, 2001; the secondary public offering was announced on May 31, 2001, and completed in June. Thus, those who purchased shares as part of the secondary offering are members of the proposed class and would be entitled to relief under § 12(a)(2) if a violation could be proven. It may be that lead plaintiffs cannot adequately represent those class members, but this is an issue to be decided in the context of a motion to certify the class. However, plaintiffs will have to be prepared to explain at that time how lead plaintiffs can serve as adequate class representatives even though they do not have claims under § 12(a)(2) or, alternatively, why plaintiffs may choose class members who do have claims under § 12(a)(2) to serve as class representatives instead of the lead plaintiff group, even though the Reform Act states that the lead plaintiff group itself must satisfy the requirements

of Fed.R.Civ.P. 23. 15 U.S.C. § 78u–4(a)(3)(B)(iii)(I)(cc).

## 2. Standard for reviewing the sufficiency of the complaint

The parties agree that the heightened pleading standards of Fed.R.Civ.P. 9(b) and 15 U.S.C. § 78u–4(b) apply to claims made under the 1934 Act. Rule 9(b) requires allegations of fraud to be pleaded with "particularity." Section 78u–4(b) requires a plaintiff to (1) identify each statement alleged to be misleading; (2) specify the reasons why the statement is misleading; and (3) "state with particularity all facts on which that belief is formed" if "an allegation regarding the statement or omission is made on information and belief." In addition, the plaintiff must allege with particularity sufficient facts allowing the drawing of a "strong inference" that the defendant acted with scienter, or an intent to deceive.

Section 78u–4(b) was enacted as part of the Private Securities Litigation Reform Act of 1995 in response to perceived litigation abuses in class actions brought under the 1934 Act. In re Party City Securities Litigation, 189 F.R.D. 91, 103 (D.N.J. 1999). Members of Congress believed some courts were not applying the requirements of Rule 9(b) in securities fraud cases with sufficient rigor and were permitting suits lacking merit to proceed. In re Advanta Corp. Securities Litigation, 180 F.3d 525, 531–32 (3d Cir.1999). Congress hoped that the pleading requirements imposed in § 78u–4(b) would create greater uniformity and help weed out frivolous suits brought by counsel for the sole purpose of obtaining a quick settlement. Behlen v. Merrill Lynch, 311 F.3d 1087, 1090–91 (11th Cir.2002).

■ On its face, § 78u–4(b) applies only to claims brought under the 1934 Act. Further, Rule 9(b) applies only to "averments of fraud." Unlike the 1934 Act, §§ 11,

12(a) and 15 of the 1933 Act do not require a plaintiff to prove that the defendant acted fraudulently. Compare Herman & MacLean v. Huddleston, 459 U.S. 375, 382, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983) (under § 11 of the 1933 Act, liability may be imposed for "innocent" misstatements); Casella v. Webb, 883 F.2d 805 (9th Cir. 1989) (applying negligence standard for claim under § 12 of the 1933 Act); Wertheim & Co. v. Codding Embryological Sciences, Inc., 620 F.2d 764 (10th Cir.1980) (scienter not an element under § 12 of 1933 Act); Phillips v. Alabama Credit Corp., 403 F.2d 693 (5th Cir.1968) (fraudulent intent not an element under § 12); with Ernst & Ernst v. Hochfelder, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976) (use of terms "manipulative" and "deceptive" in § 10b of 1934 Act demonstrates intent of Congress to limit liability under act to fraudulent conduct). The provisions under the 1933 Act impose strict liability for all false and misleading statements made in a particular context; generally, there is no mental state requirement. As a result, many courts have held that plaintiffs do not need to plead with particularity claims brought under the 1933 Act. See, e.g., Lone Star Ladies Investment Club v. Schlotzsky's, Inc., 238 F.3d 363 (5th Cir.2001); In re NationsMart Corp. Securities Litigation, 130 F.3d 309 (8th Cir.1997); Feiner v. SS & C Technologies, 11 F.Supp.2d 204 (D.Conn.1998); City of Painesville, Ohio v. First Montauk Financial Corp., 178 F.R.D. 180 (N.D.Ohio 1998); see also 2 Thomas Lee Hazen, Law of Securities Regulation, § 12.13, at 547 (4th ed. 2002) ("The particularity requirements should not be extended to claims under section 11 of the 1933 Act or section 12 of that Act since those claims do not require fraud."); 5 Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure, § 1297, at 144 (Supp.2003).

The Court of Appeals for the Seventh Circuit has not discussed this issue in depth. However, in *Sears v. Likens,* 912 F.2d 889 (7th Cir.1990), the court applied Rule 9(b) to a claim brought under §§ 5, 12, 15 and 17(a) of the 1933 Act. In a brief discussion, the court concluded that the plaintiffs' claims were "misplaced" because they "failed to state with particularity how any prospectus was false and misleading." *Id.* at 892. The court did not explain why the pleading requirements of Rule 9(b) applied even though fraud was not an element of the claims under the 1933 Act.

As other courts have noted, in *Sears,* when the court discussed the pleading requirements for claims brought pursuant to the 1933 Act, it did so in dicta. *See In re Initial Public Offering Securities Litigation,* 241 F.Supp.2d 281, 339 (S.D.N.Y. 2003) (citing *Danis v. USN Communications, Inc.,* 73 F.Supp.2d 923, 932 (N.D.Ill. 1999), *and In re First Merchants Acceptance Corp.Securities Litigation,* No. 97–C–2715, 1998 WL 781118, at *11 (N.D.Ill. Nov.4, 1998)). Before addressing the issue of particularity, the court concluded that the plaintiffs' claims under the 1933 Act failed because the plaintiffs had not alleged the existence of a prospectus and because the securities at issue in the case were exempt from the requirements of the act. Thus, the statements regarding pleading requirements were not essential to the holding and are not binding. *Klingman v. Levinson,* 114 F.3d 620, 628 (7th Cir.1997) (statements not essential to court's holding are dicta).

As a general rule, district courts should be guided by the views of the court of appeals or the Supreme Court, even when those views are expressed in dicta. *See Reich v. Continental Casualty Co.,* 33 F.3d 754, 757 (7th Cir.1994). However, when dicta is not supported by reasoning, its persuasive force is greatly diminished. *See Wilder v. Apfel,* 153 F.3d 799, 803 (7th Cir.1998) (dicta "may not express the judges' most careful, focused thinking"); *Indiana Harbor Belt Railroad Co. v. American Cyanamid Co.,* 916 F.2d 1174, 1176 (7th Cir.1990) (choosing not to follow dicta because it was not "considered" or "well-reasoned").

In *Sears,* the court provided no reasoning for the conclusion that Rule 9(b) applies to claims brought under the 1933 Act. However, courts in other circuits have reached the conclusion that Rule 9(b) applies when a claim under the 1933 Act "sounds in fraud." *In re Stac Electronics Securities Litigation,* 89 F.3d 1399 (9th Cir.1996); *Melder v. Morris,* 27 F.3d 1097 (5th Cir.1994); *Shapiro v. UJB Financial Corp.,* 964 F.2d 272 (3d Cir.1992). Of these cases, only *Shapiro* has a rationale for its conclusion. The court noted that Rule 9(b) applies to "all averments of fraud" and therefore, it applies whenever the complaint contains allegations suggesting fraudulent conduct, even if fraud is not an element of the claim. *Shapiro,* 964 F.2d at 288. Relying on this reasoning, defendants argue that the particularity requirements of Rule 9(b) should apply to plaintiffs' claims under the 1933 Act because the complaint "is devoted almost entirely to an alleged intentional 'scheme' by the defendants to inflate the price of Rayovac's common stock." Dfts.' Br., dkt. # 37, at 8. Plaintiffs disagree, asserting that their claims under the 1933 Act do not "sound in fraud" because they have expressly disavowed any suggestion that defendants acted fraudulently when they issued the prospectus and the registration statement.

In my view, the parties miss the mark in focusing on whether a complaint "sounds in fraud." Although I agree with the holding in *Shapiro* that Rule 9(b) applies to all "averments" of fraud, this requirement has little significance with re-

spect to claims that do not include fraud as an element. For the purpose of plaintiffs' claims under the 1933 Act, it does not matter whether defendants acted with an intent to deceive; plaintiffs must prove only that defendants made a material misstatement. Plaintiffs cannot add an element to a claim by making unnecessary allegations. In claims under the 1933 Act or in any other claim that does not include fraud as an element, inadequate allegations of fraud do not require dismissal for failure to state a claim. Rather, to the extent that the allegations of fraud are insufficiently particular, the proper judicial response is to ignore them. *Lone Star,* 238 F.3d at 368 ("Where averments of fraud are made in a claim in which fraud is not an element, an inadequate averments of fraud does not mean that no claim has been stated. The proper route is to disregard averment not meeting Rule 9(b)'s standard.") It makes little sense to scrutinize allegations that ultimately will have no bearing on defendants' liability.

Thus, it is unnecessary to consider whether plaintiffs' claims under the 1933 Act "sound in fraud" and, if so, whether the allegations of fraud satisfy Rule 9(b). Rather, it is necessary only to determine whether plaintiffs have stated a claim under Rule 12(b)(6), that is, whether plaintiffs have alleged sufficient facts to put defendants on notice so that they can file an answer, and whether there is any set of facts consistent with plaintiffs' allegations that would entitle plaintiffs to relief. *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 512, 514, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002).

### 3. *Alleged false and misleading statements*

To establish a violation of § 11, a plaintiff must prove that a registration statement "contained an untrue statement of material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k(a). The statute sets forth five groups of people who may be liable for the misrepresentation: (1) anyone who signed the registration statement; (2) anyone who was a director or partner in the issuer at the time of the filing; (3) anyone who is named in the registration statement as being a director or partner; (4) anyone who has certified any part of the registration statement; and (5) any underwriter of the security.

To establish a violation of § 12(a)(2), a plaintiff must show that a defendant offered or sold a security to the plaintiff by means of a prospectus or oral communication that was false or misleading with respect to material facts. Under either §§ 11 or 12(a)(2), a plaintiff does not have to show reliance, causation or scienter. *Alpern v. UtiliCorp United, Inc.,* 84 F.3d 1525, 1541 (8th Cir.1996); *Wright v. National Warranty Co.,* 953 F.2d 256 (6th Cir.1992). However, a defendant may avoid liability by proving that the plaintiff knew the statement was false when it was made. In addition, under § 12(a)(2), a defendant is not liable if he or she can prove that he did not know and could not have reasonably discovered that the statement was false.

In their complaint, plaintiffs assert their claim under § 11 against defendants Rayovac, Partners, Jones, Hussey, Shepherd, Schoen, Smith and Steward and under § 12 against all defendants. Defendant Partners argues that it was not sufficiently involved in the preparation of the registration statement to be held liable under § 11. As noted above, however, plaintiffs' claims against defendant Partners under the 1933 Act must fail because the statute of limitations has expired. It is therefore unnecessary to consider whether these

claims must be dismissed for other reasons. The remaining defendants do not deny that they either signed the registration statement for the purpose of § 11 or sold or offered securities under § 12(a)(2).

Plaintiffs rely on representations made in the prospectus for the claims under both §§ 11 and 12 because the registration statement incorporated the prospectus by reference. Defendants do not dispute the inclusion of documents incorporated by reference in determining the basis for liability under § 11. Accordingly, I will presume at this stage that the information in the prospectus was also part of the registration statement. *See Pompano–Windy City Partners, Ltd. v. Bear Stearns & Co., Inc.*, 794 F.Supp. 1265 (S.D.N.Y.1992) (assuming that documents properly incorporated by reference may be deemed part of registration statement).

Plaintiffs identify several statements in the prospectus that they contend are false or misleading. With respect to Rayovac's sales and income growth, the prospectus touts the company's "consistent improvement in operating results over the past five years." It notes specific increases in net sales ($418 million to $675 million from 1996 to 2001) and income ($27 million to $83 million). The prospectus cites greater popularity in battery-powered devices as a reason for the increase. Plaintiffs allege that these statements are false and misleading because they fail to disclose that Rayovac was able to achieve its growth through sales practices such as channel stuffing, meaning that Rayovac would use various incentives to sell its customers more than they could reasonably use and thus diminish demand for its product in the future. *See Greebel v. FTP, Software, Inc.*, 194 F.3d 185, 202 (1st Cir.1999) (" 'Channel stuffing' means inducing purchasers to increase substantially their purchases before they would, in the normal course, otherwise purchase products from the company. It has the result of shifting earnings into earlier quarters, quite likely to the detriment of earnings in later quarters.")

With respect to Rayovac's performance in Latin America, the prospectus stated that Rayovac had acquired 800 new accounts and that "We plan to continue our growth in Latin America." Plaintiffs allege that these statements are false and misleading again because they do not disclose that Rayovac was engaging in channel stuffing. In addition, plaintiffs allege that, according to a former Rayovac salesperson, "it was obvious that Rayovac was seeing a decline in its Latin American business," and that Latin America was experiencing currency devaluation.

Regarding the status of its distribution channels, the prospectus states that the "fastest growing channel" is with mass merchandisers, "where we have our strongest presence" and there are "opportunities for continued growth." It notes new distribution agreements with several large retailers. Plaintiffs allege that these statements were false and misleading because they do not disclose Rayovac's sales practices and because it was known that Kmart and many other large accounts were experiencing serious financial difficulties and would be unlikely to pay their debts to Rayovac after their accounts receivable had remained unpaid for more than six months.

Finally, the prospectus states that it was prepared in compliance with Generally Accepted Accounting Principles. Plaintiffs allege that this is not true because under GAAP, revenue may not be recognized until it has been earned and is collectible. In addition, uncollectible receivables must be accounted for. Generally Accepted Accounting Principles "are the conventions, rules and procedures that define accepted accounting practices." *United States v.*

Arthur Young & Co., 465 U.S. 805, 811, 104 S.Ct. 1495, 79 L.Ed.2d 826 (1984); *see also Young v. Lepone,* 305 F.3d 1, 5 (1st Cir.2002) (generally accepted accounting principles "embody the prevailing principles, conventions, and procedures defined by the accounting industry from time to time"). Under the regulations of the Securities and Exchange Commission, filings that do not comply with GAAP "will be presumed to be misleading and inaccurate." 17 C.F.R. § 210.4–01(a)(1).

a. Sufficiency of the allegations

▮▮▮ Defendants advance several arguments to support their contention that each of these alleged false and misleading statements fails to state a claim. First, they argue that plaintiffs have failed to plead sufficient facts showing, for example, that defendants knew that Kmart's financial difficulties were so serious that defendants violated GAAP by failing to increase Rayovac's reserves for uncollected receivables. However, I have concluded that the heightened pleading requirements of Fed. R.Civ.P. 9(b) and the Reform Act do not apply to claims under the 1933 Act. Rather, plaintiffs' allegations regarding violations of the 1933 Act need satisfy only the liberal notice pleading requirements of Fed.R.Civ.P. 8. Thus, the complaint does not need to contain "all of the facts that will be necessary to prevail." *Hoskins v. Poelstra,* 320 F.3d 761, 764 (7th Cir.2003). Under Rule 8, the "plaintiff is not required to plead facts or legal theories or cases or statutes, but merely to describe his claim briefly and simply." *Shah v. Inter–Continental Hotel Chicago Operating Corp.,* 314 F.3d 278, 282 (7th Cir.2002); *see also Walker v. Thompson,* 288 F.3d 1005, 1007 (7th Cir.2002) ("[T]here is no requirement in federal suits of pleading the facts or the elements of a claim."). So long as the complaint gives the defendant sufficient notice of the claim to file an answer, it "cannot be dismissed on the ground that it

is conclusory or fails to allege facts." *Higgs v. Carver,* 286 F.3d 437, 439 (7th Cir.2002).

In this case, plaintiffs have identified the statements they believe were misleading and provided the reasons why there were material omissions in the statements. This is sufficient to provide notice to defendants of their claims. Accordingly, plaintiffs' claims under the 1933 Act cannot be dismissed for failing to allege sufficient facts.

b. Materiality

▮▮▮ Defendants also argue that they cannot be liable under the 1933 Act because the prospectus and registration statement contained no material misstatements. With respect to the allegations regarding Rayovac's customers' financial difficulties, defendants argue that they sufficiently disclosed the risks that the company faced from large accounts. They point to a statement in the prospectus noting Rayovac's "dependence on a small number of key customers for a significant percentage of our sales [that] may negatively affect our profits." The prospectus also has a section stating: "Concentrations of Credit Risk, Major Customers and Employees. The Company has one customer that represented over 10% of its net sales." In other words, defendants contend, the alleged omissions were not material because the prospective purchasers had sufficient information to make an informed choice. An omission is material if there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information." *Basic, Inc. v. Levinson,* 485 U.S. 224, 231, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988); *see also Searls v. Glasser,* 64 F.3d 1061, 1065–66 (7th Cir.1995).

I cannot conclude as a matter of law that defendants' omissions were immaterial. The cautionary statements in the prospectus do little more than acknowledge that Rayovac has several large, important accounts. There is nothing in these statements suggesting that there were problems with these accounts at the time. Assuming the truth of plaintiffs' allegations that defendants should have known that many of its largest customers would be unable to pay their debts to Rayovac, there is a colorable argument that a reasonable investor would view the failure to disclose this information as material.

Defendants also argue that allegations regarding uncollectible receivables fail as a matter of law, because when Rayovac ultimately disclosed its bad debt reserves with respect to Kmart on January 24, 2002, Rayovac's stock price did not fall the following day. Citing *Grimes v. Navigant Consulting, Inc.*, 185 F.Supp.2d 906 (N.D.Ill.2002), defendants argue that if disclosure of negative information does not "move the market" (that is, if the price of shares does not go down), the omission is immaterial as a matter of law. The parties disagree whether the Court of Appeals for the Seventh Circuit has adopted the "move the market" rule. I question whether it is appropriate to apply a rigid rule of materiality that is not included in the statute and that cannot adapt to different factual circumstances. There may be reasons unrelated to the disclosure that insulate the price of stock from adverse effects, at least initially. *See No. 84 Employer–Teamster Joint Council Pension Trust Fund v. America West Holding Corp.*, 320 F.3d 920, 935 (9th Cir.2003) (concluding that information was material even though disclosure had no immediate effect on market price); *see also Folger Adam Co. v. PMI Industries, Inc.*, 938 F.2d 1529, 1533 (2d Cir.1991) ("[I]t is well-established that a material fact need not be outcome-determinative."). Moreover,

as plaintiffs point out, they allege a failure to disclose bad debt reserves for several of Rayovac's large customers, not just Kmart. Thus, I cannot conclude on the basis of the effect of the Kmart announcement alone that the omissions regarding uncollectible receivables were immaterial as a matter of law. Because the omissions concerning channel stuffing and problems in the distribution channels may have made the prospectus and registration statement materially misleading, I need not decide whether defendants violated generally accepted accounting principles.

However, I agree with defendants that plaintiffs cannot base a claim of liability under the 1933 Act on the statements about Rayovac's performance in Latin America that it had acquired new accounts and planned to "continue [its] growth." Plaintiffs do not challenge the accuracy of Rayovac's statements regarding the new distribution agreements it made. Even if plaintiffs' announced sales growth was misleading because of channel stuffing, this would not affect the accuracy of statements about obtaining new customers. Further, although plaintiffs allege that defendants failed to disclose in the prospectus "the additional high cost of selling in Latin America due to continued currency devaluation," as defendants point out, they admitted in the prospectus that "we are still vulnerable to the effects of currency exchange rate fluctuations."

### 4. Liability under § 15

Plaintiffs argue that all defendants except defendant Rayovac may be held liable as "control persons" under § 15 of the 1933 Act. Other than defendant Partners, defendants have made no independent argument that they cannot be held liable under § 15. Rather, they argue only that because they cannot be held liable under §§ 11 and 12, they cannot be held liable

under § 15. Because I have concluded that plaintiffs have stated a claim under §§ 11 and 12(a)(2) with respect to all defendants except defendant Partners, I will deny defendants' motion to dismiss plaintiffs' claims under § 15.

### C. Securities Exchange Act of 1934

■ To establish liability under § 10(b) and Rule 10b–5 of the 1934 Act, a plaintiff must prove that (1) the defendant made a false statement or omission (2) of material fact (3) with scienter (4) in connection with the purchase or sale of securities (5) upon which the plaintiff justifiably relied (6) and that the false statement proximately caused the plaintiff's damages. *Otto v. Variable Annuity Life Insurance Co.*, 134 F.3d 841, 851 (7th Cir.1998); *Caremark, Inc. v. Coram Healthcare Corp.*, 113 F.3d 645, 648 (7th Cir.1997). As noted above, the parties agree that plaintiffs must satisfy heightened pleading standards to state a claim under the 1934 Act. However, there appears to be some disagreement among courts regarding whether the requirements of the Reform Act supersede Rule 9(b) in securities fraud cases, and if not, whether their requirements are different. *Compare In re Navarre Corp. Securities Litigation*, 299 F.3d 735 (8th Cir.2002) (Reform Act supersedes Rule 9(b)); *In re Rockefeller Center Properties, Inc. Securities Litigation*, 311 F.3d 198, 217 (3d Cir.2002) ("The particularity in § 78u–4(b)(1) extends that of Rule 9(b)"), *with ABC Arbitrage Plaintiffs Group v. Tchuruk*, 291 F.3d 336, 349 (5th Cir.2002) (noting both standards and concluding they are the same); *Greebel*, 194 F.3d at 193 (concluding that standard under Reform Act is "congruent and consistent" with standard under Rule 9(b)). I need not weigh in on this dispute because courts agree that, to the extent the Reform Act and Rule 9(b) differ, the Reform Act imposes a more demanding standard. Thus, I will analyze the sufficiency of plaintiffs' complaint under the standard of

15 U.S.C. § 78u–4(b). If plaintiffs satisfy the requirements of the Reform Act, they will also satisfy the requirements of the federal rules, to the extent that the rules apply.

### 1. Alleged false and misleading statements

■ The first requirement of § 78u–4(b) is to identify each statement alleged to be misleading. For the most part, plaintiffs have done this. They point to the following representations as false and misleading: (1) a March 26, 2001 Rayovac press release stating that revenue for the second quarter had risen 4% and a July 26, 2001 press release announcing that revenue for the third quarter had risen 6%; (2) statements by defendant Jones in the press release and a March 26, 2001 conference call that "the market data suggests that the battery category is returning to its historic annual growth rate of six to seven percent in recent years" and that "the market" is "quickly returning to its strong historical growth trends"; (3) a statement by Jones during the conference call that Rayovac is "gaining significant momentum in all important geographic regions," that "we expect more major wins to come our way in the near future," that Rayovac is the "fastest growing battery company in the world" and "continues to outperform the market in all key segments" (defendant Jones made similar statements in the July 26, 2001 press release); (4) statements by Jones during the conference call that Rayovac's sales growth "should be in the 8–9% range"; (5) a statement by Jones that "we think our inventory position is very good, we are not overinventoried anywhere"; (6) a statement by Jones that Rayovac "experienced significant distribution wins during the quarter" that reflected "a continued momentum in our North America distribution expansion

strategy"; (7) a document filed with the SEC on March 31, 2001, and June 30, 2001, stating that alkaline sales increases "were primarily attributable to distribution gains and strong sales in the mass merchandiser and OEM trade channels"; (8) a statement by defendant Hussey at the 2001 annual shareholder meeting that "we think the stock is undervalued.... We think it should be back in the high 20s ... and it will be within six months"; (9) documents filed with the SEC in May and August 2001 and signed by defendant Steward stating that Rayovac's financial statements were prepared in conformity with generally accepted accounting principles; and (10) documents filed with the SEC in May and August 2001 that "confirmed the previously announced financial results." Plts.' Am. Cpt., dkt. # 24, at ¶¶ 46, 67. (In their complaint, plaintiffs identify as false or misleading several other statements made by defendants. Because plaintiffs do not discuss these statements in their brief in opposition to defendants' motion to dismiss, I conclude that they have conceded that these statements cannot form the basis of liability under the 1934 Act.)

I conclude that each of these statements satisfies the first requirement of § 78u–4(b)(1), with the exception of the last one: As defendants point out, plaintiffs do not identify which statements in the SEC filings "confirmed the previously announced financial results." This is insufficient. *In re K–tel International, Inc. Securities Litigation,* 300 F.3d 881, 890 (8th Cir.2002) (under Reform Act, complaint must identify "time, place and contents" of alleged misrepresentation).

2. *Reasons statements are misleading and basis for factual allegations*

The second requirement of 15 U.S.C. § 78u–4(b)(1) is to "specify the reasons why the statement is misleading." Plaintiffs allege that the above statements were false and misleading because they omitted material information regarding Rayovac's sales practices that, if revealed, would have shown that the price of Rayovac's stock was artificially inflated. Specifically, plaintiffs allege that, in contrast to defendants' optimistic outlook, demand for Rayovac products was actually in decline throughout 2001, in large part because of financial difficulties experienced by several of the company's major clients, such as Kmart. However, in order to create the appearance of growth and thus insure a successful secondary offering, defendants engaged in deceptive sales practices, such as channel stuffing. In addition, plaintiffs allege that Rayovac was carrying tens of millions of dollars of receivables from customers who were in financial distress and would not likely be able to pay in full, but that Rayovac did not increase its expenses related to uncollected receivables until after September 19, 2001. (In their complaint, plaintiffs allege the existence of other improper practices of defendants, such as failing to disclose unfavorable "trends," reclassifying Rayovac's financial statements, booking shipments to its intermediary warehouses as sales and failing to disclose the costs of promotions. However, they do not develop any argument in their briefs regarding these allegations, despite defendants' argument that they are insufficient. Accordingly, I conclude that plaintiffs have conceded that these allegations do not establish a basis for liability under the 1934 Act. *See Central States, Southeast and Southwest Areas Pension Fund v. Midwest Motor Express, Inc.,* 181 F.3d 799, 808 (7th Cir.1999)).

Section 78u–4(b)(1) also provides that if a plaintiff makes an allegation regarding a fraudulent statement or omission "on information and belief," the plaintiff must "state with particularity all facts on which that belief is formed." Defendants con-

tend that all of plaintiffs' allegations are made on information and belief and they have failed to allege sufficient facts to show that their belief is justified.

■ I note first that plaintiffs state in their complaint that their allegations are made on the basis of "investigation" of counsel rather than information and belief. However, I agree with those courts that have held that "investigation of counsel" and "information and belief" are indistinguishable for the purpose of the pleading requirements of the Reform Act. *See, e.g., In re Allaire Corp. Securities Litigation,* 224 F.Supp.2d 319, 326 (D.Mass.2002); *In re Party City Securities Litigation,* 147 F.Supp.2d 282, 303 (D.N.J.2001); *In re Theragenics Corp. Securities Litigation,* 105 F.Supp.2d 1342, 1351 (N.D.Ga.2000); *In re Green Tree Financial Corp. Stock Litigation,* 61 F.Supp.2d 860, 872 (D.Minn. 1999); *but see Zeid v. Kimberley,* 973 F.Supp. 910, 915 (N.D.Cal.1997) (concluding that plaintiffs did not need to state with particularity facts on which their beliefs were formed because their allegations were based on "investigation of counsel" rather than "information and belief"). It is not the term used in the complaint that is important, but whether the allegations are based on personal knowledge. *ABC Arbitrage,* 291 F.3d at 336 ("[T]he allegations in the complaint are not based upon Plaintiffs' personal knowledge and are therefore necessarily pleaded on 'information and belief,' although they are not labeled as such.") When allegations are derived from second-hand information, it is impossible for the court to determine whether the allegations have potential merit, unless the plaintiff identifies the facts upon which the belief is based. *See Florida State Board of Administration v. Green Tree,* 270 F.3d 645, 668 (8th Cir. 2001) (information and belief pleading provides "a road map around Rule 9(b) by asserting allegations based on speculation as to the underlying facts") (internal quo-

tations omitted). Thus, despite plaintiffs' omission of the phrase "information and belief" from the complaint, I conclude that the requirements of § 78u–4(b)(1) apply.

Plaintiffs provide the factual basis for their allegations primarily in ¶¶ 47–50 and 54–55 of their complaint. With respect to "channel stuffing" and similar practices, plaintiffs refer to statements made by several unnamed former Rayovac employees that Rayovac would (1) extend payment terms from 30 days to 60 or 90 days to convince customers to take extra, unneeded product, a practice referred to as "dating"; (2) give customers advertising credits, in which Rayovac would return 10–25% of the purchase price of the product for advertising; (3) offer customers discounts if they agreed to buy more than a certain amount of product; and (4) entice customers to purchase more than they needed for that quarter without making adjustments to sales forecasts for the following quarter.

Employees stated that Rayovac would sell "$50,000 worth of product in a quarter" to "a company that does $100,000 worth of business a year," "ja[m] product down the throat of [the] current customers," and offer discounts if the customer would purchase "pallet quantities of batteries where that type of inventory would take someone out six months." Two former sales people stated that instructions regarding channel stuffing "went all the way up to Merrill Tomlin's level." Over time, members of the sales force began to believe the cycle could not be continued indefinitely. Plaintiffs quoted them as stating that Rayovac had no "long term vision about how to get us out of that downward spiral" and sales managers were "steamed" because "growth that we may have seen from a client, we are not going to see because we just saturated them with a half of year of product." During a business trip to Hong Kong, an

employee saw numerous boxes of batteries in Rayovac's office. Other employees informed him that they received instructions to take containers of batteries to help make the quarter.

Several employees made statements regarding Rayovac's emphasis on quarter-end sales, such as, "It got to the point where Rayovac would do about 60% of the business in the last 2 or 3 weeks of the quarter," "[Y]ou know they always work miracles in the last ten or twelve working days," "There was always a drive to get orders up at the end of the month" and "The sales people were under tremendous pressure ... to make the quarter."

With respect to sales growth forecasts, plaintiffs quoted a former Rayovac salesperson as stating that there was always pressure to increase the forecast, even when it was known that the prediction could not be met.

In support of their allegations that Rayovac was carrying millions of dollars in receivables from customers in financial distress, plaintiffs quote a Rayovac employee as stating, "The Kmart thing, that really [angered] a lot of people." (Alteration in original). In addition, an employee stated, "Tomlin sent a memo saying, unless you clean up any pricing discrepancies, what they call debits, you're not going to get a bonus check." They also allege that Kmart receivables "had been outstanding well over 6 or 7 months."

 Do these allegations satisfy § 78u–4(b)(1)? The statute requires plaintiffs to "state with particularity all facts on which [their] belief is formed." I agree with plaintiffs that "all facts" does not mean all *sources*. Thus, plaintiffs' failure to identify the names of the employees they spoke with is not fatal to their claims in itself. *See In re Cabletron Systems, Inc.*, 311 F.3d 11 (1st Cir.2002); *ABC Arbitrage*, 291 F.3d at 353; *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir.2000). Rather,

the core inquiry is whether the facts alleged "provide an adequate basis for believing that the defendants' statements were false." *Novak*, 216 F.3d at 314. In making this determination, a court should consider the level of detail provided by the sources, whether the sources are corroborated by other facts alleged, the coherence and plausibility of the allegations and the number and reliability of sources. *Cabletron*, 311 F.3d at 30.

 I conclude that plaintiffs have satisfied this standard with respect to some of their allegations, but not others. A statement by an employee that the "Kmart thing" angered "a lot of people" does not provide an adequate basis to believe that Rayovac was carrying "tens of millions of dollars" of receivables from customers who could not pay. Similarly, a purported memo from defendant Tomlin, instructing salespeople to clean up "pricing discrepancies," is vague and unhelpful. Although plaintiffs allege that Rayovac was carrying six or seven months of uncollected receivables from Kmart, they provide no basis for this allegation. The only specific facts alleged by plaintiffs regarding some customers' failure to pay for product are that Kmart, Ames and Phar–Mor filed for bankruptcy in 2001 or 2002. However, it cannot be reasonably inferred from that allegation alone that defendants were making false or misleading statements about Rayovac's uncollected receivables.

 The allegations of channel stuffing manage to scrape by, if only barely. It is true, as defendants point out, that plaintiffs allege few if any specific examples of channel stuffing. In past securities fraud cases, the court of appeals has noted the lack of examples in concluding that a complaint fails to state a claim under the 1934 Act. *DiLeo v. Ernst & Young*, 901 F.2d 624, 626 (7th Cir.1990). Unlike the plaintiffs in *DiLeo*, however, plaintiffs do more

than state a conclusion that "net credit losses of $393.2 million were materially understated by approximately $4 billion in bad loans." *Id.* Plaintiffs do not simply compare rosy predictions with less favorable results and conclude that the difference "must be" attributable to fraud. *Id.* at 627. Rather, plaintiffs allege, with support from statements by former Rayovac employees, that channel stuffing at Rayovac was endemic and became more aggressive as time went on, that various techniques were continually used to get customers to purchase quantities greatly in excess of their needs and that the problem became so severe that employees believed that future sales would be seriously affected. By themselves, statements by employees that defendants put pressure on salespeople in the final days of the quarter would not suggest an improper practice, but the statements support plaintiffs' allegations about the significance of the amount of channel stuffing. Also, Rayovac's admitted financial difficulties in the first fiscal quarter of 2001 supports an inference that Rayovac may have been experiencing hidden financial difficulties in the second and third fiscal quarters as well.

 I agree with defendants that plaintiffs' allegations could be more specific and detailed. However, this is a motion to dismiss, not a motion for summary judgment. The Reform Act does not require the pleading of detailed evidentiary matters. *In re Scholastic Corp. Securities Litigation*, 252 F.3d 63, 72 (2d Cir.2001). Furthermore, despite the heightened pleading standard of the Reform Act, I must still draw all reasonable inferences in favor of plaintiffs. *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 78 (1st Cir.2002). Even without an itemized list of transactions, it is reasonable to infer from plaintiffs' allegations that defendants' channel stuffing was pervasive. Plaintiffs do not have to plead the dates of transactions or

the exact dollar amounts involved. *Cabletron*, 311 F.3d at 32; *Aldridge*, 284 F.3d at 79–82. They simply have to provide an adequate basis to believe that the defendants' statements were false. Defendants rely on *In re Brightpoint, Inc. Sec. Litigation ("Sakhrani")*, No. IP99–0870–C–H/G, 2001 WL 395752 (S.D.Ind. Mar.29, 2001), in which the court dismissed a claim for securities fraud in part because plaintiffs failed to adequately plead the existence of the defendant's improper sales practices. However, in *Sakhrani*, the only basis for the plaintiffs' allegations was that the defendant had filed a lawsuit against one of its customers for non-payment. *Id.* at *28. In that case the complaint did not identify numerous statements from various employees of the defendant attesting to widespread practices of the company. Plaintiffs' complaint alleges sufficient facts with particularity to support a belief at the motion to dismiss stage that defendants' statements were false or misleading.

### 3. *Materiality*

 Even if channel stuffing was rampant at Rayovac during the class period, this does not necessarily mean that defendants' failure to disclose it made any of defendants' statements false or misleading. Under § 10(b), failure to disclose a fact does not make a statement false or misleading unless there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information." *Basic*, 485 U.S. at 231, 108 S.Ct. 978.

Initially, plaintiffs suggest that channel stuffing violates generally accepted accounting principles. As noted above, filings that do not comply with GAAP "will be presumed to be misleading and inaccurate." 17 C.F.R. § 210.4–01(a)(1). However, as numerous courts have pointed out,

"there is nothing inherently improper in pressing for sales to be made earlier than in the normal course." *Greebel*, 194 F.3d at 202–03; *see also Cabletron*, 311 F.3d at 34–35. Plaintiffs do not otherwise explain how defendants violated accounting principles. (Plaintiffs allege that defendants violated GAAP by failing to account for uncollected receivables. However, I have concluded that plaintiffs failed to plead these allegations with sufficient particularity. Therefore, it is unnecessary to determine whether this alleged practice violated GAAP).

Nevertheless, I disagree with defendants that plaintiffs' failure to show a GAAP violation is fatal to their claim. Relying on *Greebel* and *Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1298 (9th Cir.1998), defendants suggest that channel stuffing cannot serve as a basis for liability under § 10(b). However, neither of those cases focused on the issue. Rather, in *Steckman*, the court concluded without discussion that the allegations of channel stuffing were "speculation," and in *Greebel*, the court noted only that channel stuffing is not improper in itself.

The absence of a GAAP violation does not mean the omission is not material. *K–Tel International*, 300 F.3d at 906. It is true that the purpose behind channel stuffing may not always be improper, but this does not necessarily mean that defendants had no duty to disclose this information. If in fact Rayovac was threatening future sales by overloading its customers with product, a potential investor would likely want to be aware of this fact before deciding whether to purchase stock. *In re Scientific–Atlanta, Inc. Securities Litigation*, 239 F.Supp.2d 1351, 1362–63 (N.D.Ga. 2002).

 However, even if a reasonable investor would want to know an omitted fact, there is no duty to disclose it unless omitting it alters the meaning of a statement that *was* made. *McDonald v. Kinder–Morgan, Inc.*, 287 F.3d 992, (10th Cir. 2002) (duty to disclose arises only when statement made is material and omitted fact is material to statement in that it alters its meaning). Plaintiffs point to several statements that they contend were false or misleading because they did not include disclosures regarding defendants' practice of channel stuffing, such as that Rayovac's sales had increased, that it was not overinventoried anywhere, that the stock was undervalued and would be "in the high 20s" within six months and that sales growth would be 8%–9%. Determining whether an omitted fact made a statement materially misleading "requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact." *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 450, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976). Therefore, "a materiality determination is rarely appropriate at the summary judgment stage, let alone on a motion to dismiss." *Marks v. CDW Computer Centers, Inc.*, 122 F.3d 363, 370 (7th Cir.1997). I cannot conclude at this stage that the omissions were "so obviously unimportant to investors that reasonable minds cannot differ on the question of materiality." *Shapiro*, 964 F.2d at 280 n. 11.

a. Forward-looking statements, opinion, puffery and accurate statements of historical fact

Defendants argue next that the omissions were not material because the identified statements were only "opinion and puffery" or "forward looking." Under the "safe harbor" provision of the Reform Act, 15 U.S.C. § 78u–5(c), which is similar to the "bespeaks caution" doctrine applied by courts, *e.g., Bryant v. Avado Brands, Inc.*,

187 F.3d 1271, 1276 (11th Cir.1999), there is no liability for a "forward-looking statement" if it is "identified as a forward-looking statement, and is accompanied by meaningful cautionary statements that could cause actual results to differ materially from those in the forward looking statement" *or* if the plaintiff fails to prove that the statement was made "with actual knowledge" that it was false or misleading. 15 U.S.C. § 78u–5(c)(1). Defendants argue that "nearly every" identified statement is forward-looking, though they do not identify which statements they believe are "forward-looking" and which ones are not.

 I disagree with defendants that most of the identified statements are "forward-looking." The statute provides six definitions of "forward-looking statements," including "a projection" of revenues, income and earnings, "plans and objectives of management for future operations," and "a statement of future economic performance." The Court of Appeals for the Eleventh Circuit has summarized the definition of a forward-looking statement as one whose truth cannot be determined until after the statement is made. *Harris v. Ivax Corp.*, 182 F.3d 799, 805 (11th Cir.1999). Most of the statements at issue are not forecasts or projections, but descriptions of past and current conditions. The March 26, 2001 press release states that revenue for the second quarter *had risen* 4%; in the March 26, 2001 conference call, defendant Jones states that "we *are* not overinventoried anywhere" and defendant Hussey stated "we still think the stock *is* undervalued." (Emphasis added.) The accuracy of these statements could have been determined at the time they were made.

 However, I agree that some of the statements are forward-looking. Defendant Jones was making a forecast when he stated that he was "comfortable" that sales growth would be at 8–9% in second half of 2001. *See Helwig v. Vencor, Inc.* 251 F.3d 540, 554 (6th Cir.2001) (statement that company was "comfortable" in stating projected fourth quarter earnings was forward-looking). Similarly, defendant Hussey's statement that he believed the price of Rayovac stock "should be back in the high 20s ... within six months" is a statement of future economic performance. *In re Advanta Corp. Securities Litigation,* 180 F.3d 525 (3d Cir.1999) (statement that company's revenues would increase over next six months was forward-looking). Thus, the first question is whether these statements were "identified as forward-looking" and whether they were "accompanied by meaningful cautionary language."

 Defendants do not identify any cautionary language that accompanied defendant Hussey's statement that the price of Rayovac would rise to "the high 20s" in the next six months. However, defendant Jones's prediction of 8–9% growth was made during a conference call that began with the following statement:

This broadcast may include forward-looking statements which are based in part on management's estimates, assumptions, and projections as of today. These statements are subject to certain risks and uncertainties and other factors that can cause results to materially differ from what we currently expect. Actual results may differ due to changes in external competitive market factors, changes in our industry or the economy in general, as well as various other factors including those we discuss today and those discussed in our securities filings, including our most recent annual report on form 10–K. We assume no obligations to update these statements.

(Defendants note that under 15 U.S.C. § 78u–5(c)(2)(B)(i), it could incorporate by

reference cautionary language contained in a "readily available written document," such as a Form 10–K. However, they provide no citation to this document or state what the cautionary language was. District courts are not required to scour the record for relevant information. *Johnson v. Cambridge Industries, Inc.,* 325 F.3d 892, 898 (7th Cir.2003). Thus, I have considered only the cautionary language cited from the conference call.)

■■■ To be "meaningful," a cautionary statement does not have to "explicitly mention the factor that ultimately belies a forward-looking statement." *Harris,* 182 F.3d at 807. However, "generic disclaimer[s]" and "boilerplate warnings" will not suffice. *Helwig,* 251 F.3d at 558. Rather, the warned risk must be sufficiently similar to the subsequent adverse events to provide "notice of the danger of the investment" so that the investor can make "an intelligent decision about it according to her own preferences for risk and reward." *Harris,* 182 F.3d at 807. I cannot conclude that an advisement regarding "competitive market factors" and "changes in our industry or the economy" would effectively put an investor on notice of the risk of substantially decreased demand resulting from channel stuffing. Market factors and change in the economy are external sources of change over which defendants would have little control. The same cannot be said for selling a year's worth of product to a customer in one quarter in order to create the appearance of growth.

Even a forward-looking statement unaccompanied by meaningful cautionary language is protected by the safe harbor provision when the plaintiff fails to prove that the defendant had "actual knowledge" of the statement's falsity. Because this question overlaps with the issue of scienter, I will discuss both issues together below.

■■■ Apart from the issue whether defendants' statements are forward-looking, defendant argues that many of them are merely "opinion and puffery" and are therefore not material. They point to the use of words such as "believe" and "think," as showing that the statements were not to be taken seriously. Defendants are correct that some statements are "simply too vague to constitute a material misstatement of fact." *Searls,* 64 F.3d at 1066. "It would be unreasonable for investors to attach significance to *general* expressions of satisfaction with the progress of the seller's efforts." *Eisenstadt v. Centel Corp.,* 113 F.3d 738, 745 (7th Cir.1997). For example, in *Searls,* the court held that the phrase "recession-resistant" was "devoid of any substantive information" and thus not material. *Id.* Similarly, in *Lasker v. New York State Electric & Gas Corp.,* 85 F.3d 55, 59 (2d Cir.1996), the court held that a statement that "business strategies would lead to continued prosperity" was "puffery" that would not mislead a reasonable investor. I agree that some of the statements fall into these categories. For instance, statements that Rayovac was the "fastest growing battery company in the world" and that "the market" is "quickly returning to its strong historical growth trends" are "optimistic rhetoric." *Searls,* 64 F.3d at 1066. However, a statement is not immaterial as a matter of law simply because the speaker prefaces it with "I believe" or "I think." A reasonable investor could find statements significant even if they are not made with absolute certainty. This is underscored by the questions asked at the March 26, 2001 conference call. Questions were asked repeatedly to clarify the projected rate of sales growth and each time defendant Jones confirmed that the rate "should be" 8%–9%. A statement is not mere "puffery" when it provides specific facts that may be relied on. *Newman v. Rothschild,* 662 F.Supp. 957, 959 (S.D.N.Y.1987). Even general statements may be considered misleading if

they are "concealing a disaster." *Eisenstadt,* 113 F.3d at 745. Thus, if defendants gave opinions made with no belief of their truth, they are not immune to a lawsuit. *Virginia Bankshares, Inc. v. Sandberg,* 501 U.S. 1083, 1095, 111 S.Ct. 2749, 115 L.Ed.2d 929 (1991) ("A statement of belief may be open to objection … as a misstatement of the psychological fact of the speaker's belief in what he says.") Again, whether plaintiffs have sufficiently pleaded that defendants knew their opinions were false when made must be decided in the context of determining whether defendants acted with scienter, which is discussed below.

■ Finally, defendants contend that "several" of the statements were "accurate historical statements of fact" and thus were not misleading. Again, defendants do not identify which statements fall into this category. I presume that defendants are referring to the statements regarding Rayovac's sales and income during the second and third quarters of 2001.

■ Defendants are correct that plaintiffs do not characterize as literally false the sales and income figures for the second and third quarters. Further, it is true that "accurate historical data does not become misleading even if less favorable results might be predictable by the company in the future." *In re Sofamor Danek Group, Inc.,* 123 F.3d 394, 401 (6th Cir. 1997). However, it is well-established that a statement that is technically true can still be misleading. *McMahan & Co. v. Wherehouse Entertainment, Inc.,* 900 F.2d 576, 579 (2d Cir.1990) ("Some statements, although literally accurate, can become, through their context and manner of presentation, devices which mislead investors.") Plaintiffs argue that the reports of sales and income growth were misleading because defendants did not disclose the role that channel stuffing played in artificially inflating the percentage. As noted

above, I cannot conclude as a matter of law that reasonable investors would not have found this omission significant. Thus, defendants are not immune from liability even though a statement is technically correct.

### 4. *Group pleading*

Having determined that some of the statements identified in the complaint may be material, I must next consider whether plaintiffs have pleaded sufficient facts to state a claim against the various defendants. This requires two related inquiries. First, I must consider whether plaintiffs have pleaded sufficient facts showing that each defendant made the misstatements. (Plaintiffs contend that all the defendants may be held liable for a primary violation with respect to all of the misleading statements.) Second, I must determine whether plaintiffs have adequately pleaded defendants' requisite state of mind, as required by the Reform Act.

■ When a plaintiff sues multiple defendants in a fraud case, the general rule is that the plaintiff must " 'inform each defendant of the nature of his alleged participation in the fraud.' " *Vicom, Inc. v. Harbridge Merchant Services, Inc.,* 20 F.3d 771, 778 (7th Cir.1994). (quoting *DiVittorio v. Equidyne Extractive Industries, Inc.,* 822 F.2d 1242, 1247 (2d Cir. 1987)). This rule is often interpreted as requiring the plaintiff "to specify which defendant made each of the alleged misrepresentations." 5 Wright & Miller, *Federal Practice & Procedure,* § 1297, at 144 (2d ed. Supp.2003). However, some courts relax this rule when a statement is made in a "group-published" document, such as a press release or an annual report. *E.g., Schwartz v. Celestial Seasonings, Inc.,* 124 F.3d 1246 (10th Cir.1997); *Wool v. Tandem Computers, Inc.,* 818 F.2d 1433 (9th Cir.1987); *Luce v. Edelstein,* 802 F.2d 49

(2d Cir.1986). In such a case, these courts reason that "it is reasonable to presume that these are the collective actions of the officers." *Wool,* 818 F.2d at 1440. This presumption may apply to outside directors as well when the complaint contains allegations that they participated in the day-to-day corporate activities or prepared group information at particular times. *In re GlenFed, Inc. Securities Litigation,* 60 F.3d 591 (9th Cir.1995). Although the Court of Appeals for the Seventh Circuit has never expressly adopted the group pleading doctrine, I disagree with defendants that it has expressly rejected it. Rather, in cases such as *Vicom* and *Goren v. New Vision International, Inc.,* 156 F.3d 721 (7th Cir.1998), the court stated only that the allegations must be specific enough so that the defendants are notified of their purported role in the scheme. *See also Sears,* 912 F.2d 889 (stating in dicta that "complaint that attributes misrepresentations to all defendants, lumped together for pleading purposes, generally is insufficient"). This is not inconsistent with group pleading, under which individual defendants are informed of their role in the scheme through their involvement in the group.

A number of courts have held that the so-called group pleading doctrine is not viable now that the Reform Act has been passed, whatever its status was before the Act's passage. *See, e.g., In re Digital Island Securities Litigation,* 223 F.Supp.2d 546, 553 (D.Del.2002): *Coates v. Heartland Wireless Communications, Inc.,* 26 F.Supp.2d 910, 916 (S.D.Tex.1998). Others, however, have concluded that group pleading survives the Reform Act. *Martino–Catt v. E.I. duPont de Nemours & Co.,* 213 F.R.D. 308, 315 (S.D.Iowa 2003); *In re Allaire Corp. Securities Litigation,* 224 F.Supp.2d 319, 340–41 (D.Mass.2002); *Tricontinental Industries Ltd. v. Anixter,* 215 F.Supp.2d 942, 947 (N.D.Ill.2002); *In re Sunterra Corp. Securities Litigation,* 199 F.Supp.2d 1308, 1327 (M.D.Fla.2002).

The Reform Act neither abolishes nor endorses the group pleading doctrine. Courts that have continued to apply it reason that if Congress had disproved of the practice, it could have expressly forbidden it when it amended the 1934 Act. *See, e.g., In re BankAmerica Corp. Securities Litigation,* 78 F.Supp.2d 976 (E.D.Mo. 1999). Those courts that now reject group pleading note that the Reform Act requires that false and misleading statements be set forth with particularity as to "the defendant," suggesting that a failure to plead particular facts regarding which defendants made the statement is fatal to the claim. *E.g., Allison v. Brooktree Corp.,* 999 F.Supp. 1342, 1350 (S.D.Cal. 1998).

I agree with those courts rejecting the group pleading doctrine that there is tension between the particularity requirements of the Reform Act and the attribution of statements to individuals on no basis other than their position in the company. At the same time, I recognize that many outside the group itself will lack knowledge of which individuals participated in drafting a "group document." Thus, unless a plaintiff can obtain information from a high-ranking officer regarding the identities of these individuals before filing the lawsuit, many individual defendants may be effectively immune from suit because the plaintiff will be unable to sue them without discovery. The purpose of the Reform Act was to discourage frivolous suits, not to bar recovery for meritorious claims. Thus, some courts will permit group pleading when facts that would provide greater particularity are exclusively within the defendants' knowledge. *See, e.g., Waltree Ltd. v. Ing Furman Selz, LLC,* 97 F.Supp.2d 464, 469 n. 6 (S.D.N.Y. 2000).

The approach of the court in *Waltree* appears both logical and fair, provided that it is reasonable to infer that a particular defendant would have participated in drafting the statement. However, I do not believe that I can draw such an inference by knowing only an individual's position in the company. A private plaintiff may not maintain an aiding and abetting suit under § 10(b). *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994). Only those persons actually involved in making the statement can be liable for a primary violation. Neither plaintiffs nor the cases on which they rely point to any evidence that all corporate offices routinely participate in drafting press releases and financial statements. *See* William O. Fisher, *The Rise and Possible Demise of the "Group Pleading" Protocol in 10b–5 Cases,* 56 Bus. Law. 991, 1053–54 (2001) (arguing that there is likely great variation in degree to which officers are involved in drafting press releases and financial statements). Thus, to satisfy the requirements of the Reform Act, plaintiffs must allege facts suggesting *some* particularized basis for concluding that each defendant "made" the statement at issue, such as that the defendant had drafted that type of document in the past or was generally responsible for doing so. *See, e.g., In re Oak Securities Technology,* No. 96–20552 SW, 1997 WL 448168, *11 (N.D.Cal. Aug.1, 1997).

In this case, plaintiffs have identified only three individuals that made allegedly false or misleading statements: defendants Jones, Steward and Hussey. Plaintiffs have alleged *no* particularized facts that would permit me to infer that the other individual defendants participated in making any of the statements. With respect to defendant Partners, plaintiffs allege that this defendant owned approximately 26% of the outstanding shares of Rayovac stock during the class period.

This too is insufficient. Accordingly, I will dismiss plaintiffs' claims under § 10(b) against all defendants, with the exceptions of defendants Rayovac, Jones, and Hussey. (The only misleading statements attributed to defendant Steward were the Forms 10–Q for the second and third quarters of 2001, which stated that Rayovac's financial statements were prepared in conformity with generally accepted accounting principles and "confirmed the previously-announced financial results." Because I have concluded that plaintiffs have failed to allege facts supporting these claims with particularity, the claims against this defendant must be dismissed as well.)

## 5. *Scienter*

Under the Reform Act, a complaint in a securities fraud case under the 1934 Act must "state with particularity facts giving rise to a strong inference of scienter." 15 U.S.C § 78u–4(b)(2). The Court of Appeals for the Seventh Circuit has held that "scienter" under the 1934 Act requires an "intent to deceive," which it has interpreted as including "a reckless disregard for the truth." *Securities and Exchange Commission v. Jakubowski,* 150 F.3d 675, 681 (7th Cir.1998). This means that the "danger of misleading buyers must be actually known or so obvious that any reasonable man would be legally bound as knowing." *Sundstrand Corp. v. Sun Chemical Corp.,* 553 F.2d 1033, 1045 (7th Cir.1977).

Although the Reform Act was passed in part to resolve conflicts among the circuits in applying the scienter requirement, H.R.Rep. No. 104–369, at 41, *reprinted in* 1995 U.S.C.C.A.N. 730, 741, courts have continued to disagree over what plaintiffs must plead to satisfy the new standard. Under the test employed by the Court of Appeals for the Second Circuit, plaintiffs may show a strong implication of scienter

by pleading facts showing that the defendants had a motive and opportunity to commit fraud. *Rothman v. Gregor,* 220 F.3d 81, 90 (2d Cir.2000). *See also In re Advanta Corp. Securities Litigation,* 180 F.3d 525 (3d Cir.1999) (concluding that showing of motive and opportunity satisfies pleading requirements of Reform Act). Thus, if a plaintiff alleges that a defendant obtained a "concrete" benefit for the alleged misrepresentation, this is sufficient to survive a motion to dismiss. *Novak,* 216 F.3d at 307. Other courts have held that although allegations of motive and opportunity could be sufficient in some circumstances to support a strong inference, a court must consider the factual context before making a determination. *Florida State Board of Administration v. Green Tree,* 270 F.3d 645, 660 (8th Cir.2001); *Nathenson v. Zonagen, Inc.,* 267 F.3d 400, 410–11 (5th Cir.2001); *Helwig v. Vencor, Inc.,* 251 F.3d 540 (6th Cir.2001); *Greebel,* 194 F.3d at 196–97. One court has held that allegations of motive and opportunity are never sufficient by themselves. *In re Silicon Graphics, Inc. Securities Litigation,* 183 F.3d 970 (9th Cir.1999). However, most courts agree that the Reform Act did not alter the requisite state of mind for violations of the 1934 Act. *See, e.g., Nathenson,* 267 F.3d at 408; *In re Comshare, Inc. Securities Litigation,* 183 F.3d 542, 552–53 (6th Cir.1999). Rather, it changed the way plaintiffs must plead scienter. Thus, the reckless standard from *Jakubowski* and *Sundstrand* still applies.

In support of scienter, plaintiffs allege that each of the defendants sold a substantial number of shares in the secondary offering, which occurred three months before Rayovac announced that its fourth quarter results would be disappointing. Specifically, defendant Jones sold 437,000 shares for approximately $8 million dollars, defendant Hussey sold 100,000 shares for $1.9 million and defendant Rayovac sold 3.5 million shares for $68 million.

(Because I have concluded that plaintiffs failed to plead sufficient facts showing that the remaining defendants were responsible for the alleged false and misleading statements, I need not consider whether plaintiffs have demonstrated a strong likelihood of scienter with respect to those defendants.) Plaintiffs argue that this "insider trading" shows that defendants wanted to conceal Rayovac's true financial status until after the secondary offering was completed and they had profited from selling their overvalued stock. In addition, relying on *In re Allied Products Corp. Securities Litigation,* No. 99 C 3597, 2000 WL 1721042 (N.D.Ill. Nov.15, 2000), plaintiffs contend that defendants "can be presumed to have knowledge of core business matters," which includes the sales practices used to sell their products.

First, I disagree with those courts that have relied on legislative history to determine Congress's intent with respect to what facts are sufficient to satisfy the Reform Act's scienter requirement. The plain language of the statute requires a "strong inference"; it does not detail *how* a strong inference is shown. *See Helwig,* 251 F.3d at 551 ("In enacting the PSLRA, Congress was concerned with the quantum, not type, of proof.") If Congress wanted to further define the meaning of "strong inference" it could have done so in the text of the statute, but it chose not to. Thus, it is unnecessary to plow through the various committee reports and floor debates to determine whether a showing of motive and opportunity suffices. Rather, the absence of a more rigid definition evinces Congress's intent that courts examine factual allegations on a case-by-case basis to determine whether they are sufficiently "strong" to show scienter. I therefore agree with those courts that have concluded that there is no per se rule that a showing of motive and opportunity does or does not satisfy the Reform Act's plead-

ing requirements for scienter. *See Green Tree,* 270 F.3d at 660 (motive and opportunity allegations "may meet the Reform Act standard, but if so it is because they give rise to a strong inference of scienter, not merely because they establish motive and opportunity").

A number of courts have concluded that specific allegations of insider trading could be sufficient to create a strong inference of scienter in some circumstances. *See, e.g., Ronconi v. Larkin,* 253 F.3d 423, 434–35 (9th Cir.2001); *Geffon v. Micrion Corp.,* 249 F.3d 29, 36 (1st Cir.2001). The Court of Appeals for the Ninth Circuit observed: "If insiders owning much of a company's stock make rosy characterizations of company performance to the market while simultaneously selling off all their stock for no apparent reason, their sales may support inferences both that their rosy characterizations are false and that they knew it." *Ronconi,* 253 F.3d at 434–35. In determining whether the allegations are sufficient, courts have looked at several factors, including: (1) whether those alleged to have engaged in insider trading are the same as those alleged to have made fraudulent statements; (2) how much and what percentage of the defendant's shares of stock were traded; (3) the timing of the trading; and (4) whether the trading was consistent with the defendant's previous practices. *Scholastic Corp.,* 252 F.3d at 74–75; *Silicon Graphics;* 183 F.3d at 986.

Some of these factors weigh in plaintiffs favor. Defendants Jones and Hussey both made allegedly misleading statements, sold large amounts of stock and conducted trading around the time the statements were made and less than three months before the "bad news" was announced. However, plaintiffs have provided no allegations regarding how much stock the defendants *retained* or whether their trading activity was unusual for them. Without

these facts, it is impossible to determine whether defendants' trading raises suspicion. *See America West,* 320 F.3d at 938; *Greebel,* 194 F.3d at 207; *In re Baker Hughes Securities Litigation,* 136 F.Supp.2d 630, 646 (S.D.Tex.2001); *In re Baan Co. Securities Litigation,* 103 F.Supp.2d 1, 19 (D.D.C.2000); *Rehm v. Eagle Finance Corp.,* 954 F.Supp. 1246, 1254 (N.D.Ill.1997).

█ I also cannot conclude that a "strong inference" is generated solely because of a defendant's position with the company. My reasoning is the same as in the discussion of group pleading: using a presumption to satisfy the scienter requirement is inconsistent with the particularity requirements of the Reform Act. Admittedly, the inference that plaintiffs ask the court to draw, that officers and directors are aware of the corporation's "core business matters," appears more reasonable than assuming that an officer participated in drafting a particular document. However, it still relies on a "must have known" logic that the court of appeals has rejected even under Rule 9(b). *DiLeo,* 901 F.2d at 629. Furthermore, I question whether a federal court is qualified to make judgments about whether a particular practice is part of a company's "core business matters." Absent a showing that an officer had a *duty* to monitor particular information, alleging a defendant's job title is insufficient to plead scienter adequately. *See Kushner v. Beverly Enterprises, Inc.,* 317 F.3d 820, 828 (8th Cir.2003).

The only other fact alleged to support a showing of scienter is that defendant Jones directed management to exert pressure on salespeople to increase their sales forecasts and sell more product. However, pushing for more sales is hardly grounds for a fraud claim. It would be more surprising if officers did not put sales demands on their employees. Regardless,

doing so does not create a strong inference of scienter.

Because I have concluded that plaintiffs have not satisfied the Reform Act's scienter requirement, it follows that plaintiffs have not adequately pleaded that defendants made their forward-looking statements with actual knowledge of their falsity. In addition, if defendants cannot be held liable for primary violations of the 1934 Act, there is no "control person" liability either. Accordingly, I must dismiss plaintiffs' claims against defendants under § 10(b), Rule 10b–5 and § 20(a) of the 1934 Act.

I disagree with defendants that the dismissal of these claims should be with prejudice. I cannot conclude that plaintiffs will be unable to cure the complaint's deficiencies. Plaintiffs may have until June 18, 2003, to file and serve an amended complaint addressing the deficiencies identified in this opinion. Defendants may have until July 9, 2003, to file and serve a motion to dismiss; plaintiffs may have until July 30, 2003, in which to file and serve a brief in opposition; and defendants may have until August 9, 2003, to serve and file a reply brief. No extensions will be granted.

### ORDER

IT IS ORDERED that

1. Plaintiffs' motion to dismiss Luis Cancio from the action and add Thomas H. Lee Partners as a defendant is GRANTED.

2. The motion to dismiss filed by defendant Thomas H. Lee Partners is GRANTED with respect to plaintiffs' claims under the Securities Act of 1933 for failure to state a claim upon which relief may be granted. Those claims are DISMISSED WITH PREJUDICE from this action.

3. The motion to dismiss filed by the remaining defendants is DENIED with respect to plaintiffs' claims under the Securities Act of 1933.

4. Defendants' motions to dismiss are STAYED with respect to their claims under the Securities Exchange Act of 1934 so that plaintiffs may attempt to cure the pleading deficiencies identified in this opinion. Plaintiffs may have until June 18, 2003, to file and serve an amended complaint. Defendants may have until July 9, 2003, to file and serve a motion to dismiss; plaintiffs may have until July 30, 2003, in which to file and serve a brief in opposition; and defendants may have until August 9, 2003, to serve and file a reply brief.

4. If plaintiffs do not file an amended complaint by June 18, 2003, plaintiffs' claims under the 1934 Act will be dismissed with prejudice for failure to state a claim upon which relief may be granted.