Hans A. QUAAK, Atillio Po and Karl Leibinger, on behalf of themselves and those similarly situated Plaintiffs,

v.

DEXIA, S.A. and Dexia Bank Belgium (formerly known as Artesia Banking Corp., S.A.), Defendants.

No. CIV.A.03–11566–PBS.

United States District Court, D. Massachusetts.

Feb. 9, 2005.

Jeffrey C. Block, Berman DeValerio Pease Tabacco Burt & Pucillo, Patrick T. Egan, Berman DeValerio Pease Tabacco Burt & Pucillo, Boston, MA, Michael T. Matraia, Law Office of Michael T. Matraia P.C., Worcester, MA, Nicole Robbins Starr, Berman DeValerio Pease Tobacco Burt & Pucillo, Boston, MA, for Plaintiffs.

· Sara Beth Brody, Clifford Chance U.S. LLP, San Francisco, CA, Breton T. Leone–Quick, Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, PC, Boston, MA, Sean Miles Murphy, Clifford Chance U.S. LLP, New York City, Peter M. Saparoff, Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, PC, Boston, MA, James B. Weidner, Clifford Chance U.S. LLP, New York City, for Defendants.

## MEMORANDUM AND ORDER

SARIS, District Judge.

### I. INTRODUCTION

Class plaintiffs bring claims for securities fraud against Dexia Bank Belgium ("Dexia"), the successor to Artesia Banking Corp., S.A. ("Artesia"), the former chief commercial banker for Lernout & Hauspie Speech Products N.V. ("L & H").[1] Defendant has moved to dismiss, arguing that the claims are time-barred and that their allegations fail to support a claim for primary liability under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5 promulgated by the Securities and Exchange Commission (SEC), 17 C.F.R. § 240.10b–5. After hearing, the motion to dismiss is *DENIED*.

### II. FACTUAL BACKGROUND

The Second Amended Class Action Complaint alleges the following facts.[2]

In March of 1997, the Brussels Translation Group N.V. ("BTG") was established, purportedly to develop machine translation software. (¶ 81.) Artesia provided the initial financing to allow BTG to operate. *Id.* That same year, L & H purported to license software and provide engineering services to BTG in exchange for millions of dollars in fees and royalties. (¶¶ 82, 83.) Artesia loaned BTG $22.9 million. (¶ 81.) It loaned these funds to BTG so that BTG would use them to pay L & H, which would then pass the money off to investors as legitimate L & H licensing revenue. *Id.* From 1997 through 1999, L & H improperly recorded almost $35 million in

revenues from the BTG transaction. (¶ 84.) At the end of the contract, in June 1999, L & H purchased BTG for $59 million. *Id.* The sole purpose of the BTG transaction was to inflate L & H's reported financial results. (¶ 85.)

Beginning in 1998, Artesia provided L & H and L & H's senior officers—Lernout, Hauspie, and Willaert ("Senior Officers")—with funding for the Language Development Companies ("LDCs") and Cross–Language Development Companies ("CLDCs") in order to expand L & H's generation of fictitious revenue. (¶ 97.) Artesia and L & H agreed that L & H would create a series of holding companies financed by Artesia. (*Id.*) These holding companies were used to finance multiple LDCs. (*Id.*)

One such holding company was Radial Belgium N.V. ("Radial"). (¶ 98.) On September 29, 1998, Artesia loaned Radial approximately $6 million, which Radial wired in three $2 million installments to three LDCs. (*Id.*) These LDCs used all $2 million to pay L & H licensing fees, which L & H booked as $6 million of revenue in the third quarter of 1998. (*Id.*)

Because Artesia knew that none of these LDCs had any bona fide offices or operations that would have enabled them to develop speech recognition products, and that the money would be used by the LDCs to pay licensing fees to L & H, it refused to lend any money to these LDCs unless the Senior Officers guaranteed these loans by means of credit default swaps. (¶¶ 98–99.) Artesia and the Senior

1. Plaintiffs had also brought claims against Dexia S.A. but agreed to dismiss Dexia S.A. based on defendant's representation that Dexia S.A. assumed no liabilities of Artesia.

2. This Court has written several extensive opinions concerning the alleged fraudulent scheme at L & H. Familiarity with the facts set out in those opinions is assumed. *See,* *e.g., In re Lernout & Hauspie Sec. Litig.,* 208 F.Supp.2d 74 (D.Mass.2002); *In re Lernout & Hauspie Sec. Litig.,* 230 F.Supp.2d 152 (D.Mass.2002); *In re Lernout & Hauspie Sec. Litig.,* 286 B.R. 33 (D.Mass.2002); *Bamberg v. SG Cowen,* 236 F.Supp.2d 79 (D.Mass. Dec.9, 2002); *In re Lernout & Hauspie Sec. Litig.,* 236 F.Supp.2d 161 (D.Mass.2003).

Officers agreed to structure these guarantees in a manner designed to enable L & H fraudulently to conceal the guarantees from the SEC and the investing public. (¶ 99.) In a September 21, 1999 e-mail, P. Rabaey at Artesia wrote to G. Dauwe and other Artesia employees, "The private guarantees ... were not signed by Jo [Lernout], Pol [Hauspie] and Nico [Willaert] so as to avoid possible problems with the SEC. We have therefore no security and look for a solution via credit default swaps." (¶¶ 100, 103.)

Artesia knew that the credit default swaps were highly unusual for individuals on commercial loans and were used on the LDC/CLDC loans specifically to mislead L & H investors. (¶ 119.) An internal Artesia document notes that the reference to the credit default swaps had been deleted from one of the letters of credit issued in connection with the LDC loans and that the letter "was not signed by the borrowers (refused because of possible fiscal and auditing problems when filing the financial statements)." (¶ 120.)

On December 22, 1998, Artesia loaned Language Investment Company ("LIC")—an entity equivalent to Radial—$6 million for the establishment and funding of four more LDCs. (¶ 107.) Again, Artesia knew that the entities were shams and that the loans would be used to pay licensing fees to L & H, and were backed by credit default swaps entered into by the Senior Officers to avoid SEC disclosure problems. (¶¶ 108–109.)

L & H and Artesia continued to perpetuate this fraudulent scheme in 1999. (¶ 111.) On March 31, 1999, L & H set up the Language Development Fund ("LDF") and transferred $12 million to the bank accounts of seven LDCs. (*Id.*) In the second quarter of 1999, L & H requested that LDF receive a $20 million loan from Artesia. (¶ 113.) Artesia was aware that the $20 million sought by L & H was an integral

part of the fraud being perpetrated at L & H. (*Id.*) B. Ferrand of Artesia wrote in an e-mail dated June 21, 1999:

> In view of the fact that [L & H] books the sale of licenses as revenue, it is essential under GAAP rules that LDF be totally independent from [L & H]. Therefore, [L & H] cannot under any circumstances be a party involved in an agreement whose subject is the repayment of the requested financing. A credit default swap with Messrs. Lernout, Hauspie, and Willaert is however possible.

(*Id.*)

On June 25, 1999, Artesia granted a personal $20 million line of credit to the Senior Officers to take the place of an LDF loan in furtherance of the fraudulent scheme to inflate L & H's revenue and earnings. (¶ 114.) This time, Artesia demanded that the three individuals pledge 650,000 registered shares of L & H as collateral for the loan. (*Id.*) The vast majority of this $20 million was used to fund six new LDCs, and this money was ultimately booked as revenue on L & H's financial statements. (*Id.*) L & H did not reveal the source of the funds received by the LDCs in L & H's SEC Form 10–Q for the quarter ended June 30, 1999, or in its SEC Form 10–K for the year ended December 31, 1999. (*Id.*)

By mid to late 1999, Artesia became increasingly concerned that its loans would not be repaid. (¶ 115.) The loans to Radial and LIC were due on June 30, 1999, and the $20 million personal loan to the Senior Officers was due in October 1999. (*Id.*) Artesia nonetheless extended the loans to December 15, 1999 and subsequently engaged in multiple discussions with the Senior Officers to track their progress in attracting new investors whose funds would be used by L & H to repay Artesia. (*Id.*)

After Artesia had begun funding L & H's fraudulent LDC operations through Radial, it knowingly participated in another L & H improper revenue recognition scheme involving Vasco Data Security International ("Vasco"). (¶ 122.) In 1998 and 1999, Vasco entered into two purported licensing agreements for L & H software, for $800,000 and $900,000 respectively. (¶ 123.) In fact, Vasco had no use for the L & H software. (*Id.*) L & H loaned Vasco $3 million at about the same time. (*Id.*) L & H insisted that Vasco backdate the second licensing agreement, and recorded revenue for both agreements in 1998, despite the outstanding loan to Vasco. (¶ 126.)

L & H allowed Vasco to repay its $3 million dollar loan in the second quarter of 1999 through a private placement of Vasco stock organized by Artesia at the behest of Lernout and Hauspie. (¶ 124.) Top investors included various L & H related entities, including Mercator and LHIC, a company formed by Lernout and Hauspie. (*Id.*) On April 15, 1999, Artesia wired approximately $11.5 million, the proceeds of the private placement, to Vasco's account. (¶ 125.)

### III. DISCUSSION

#### A. *Sarbanes–Oxley*

The principal issue in this motion to dismiss is whether plaintiffs' claims are timely. Prior to the passage of the Sarbanes–Oxley Act of 2002 ("Sarbanes–Oxley"),[3] Section 10(b) claims had to be "commenced within one year after the discovery of the facts constituting the violation and within three years after such violation." *Bamberg*, 236 F.Supp.2d at 84 (quoting *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 364, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991)).

Section 804 of Sarbanes–Oxley amends 28 U.S.C. § 1658 by lengthening the statute of limitations for private causes of action alleging fraud, providing:

(a) ... [A] private right of action that involves a claim of fraud, deceit, manipulation, or contrivance in contravention of a regulatory requirement concerning the securities laws, as defined in section 3(a)(47) of the Securities Exchange Act of 1934 ... may be brought not later than the earlier of—

(1) 2 years after the discovery of the facts constituting the violation; or

(2) 5 years after such violation.

(b) EFFECTIVE DATE.—The limitations period provided by section 1658(b) of title 28, United State Code, as added by this section, shall apply to all proceedings addressed by this section that are commenced on or after the date of enactment of this Act.

(c) NO CREATION OF ACTIONS.— Nothing in this section shall create a new, private right of action.

Public Company Accounting Reform and Investor Protection Act of 2002, Pub.L. 107–204 § 804, 116 Stat. 745, 801 (2002).

#### B. *Is this a New Proceeding?*

Plaintiffs filed a consolidated complaint related to the L & H fraud on September 21, 2001 against L & H Senior Officers and directors, L & H's public accountants, and other individuals and entities that they alleged were involved. Plaintiffs filed the complaint in this case on August 19, 2003. Defendant argues that the longer limitations period of Sarbanes–Oxley does not apply to this complaint because it is not a new proceeding commenced after July 30, 2002, but rather a *de facto* amendment to

---

**3.** Public Company Accounting and Investor Protection Act of 2002 (Sarbanes Oxley Act of 2002), Pub.L. 107–204, § 804, 116 Stat. 745, 801 (codified in part at 28 U.S.C. § 1658(b)), was signed into law by President Bush on July 30, 2002.

the pending L & H action. (*See* Def.'s Mem. at 5–6.)

Following oral argument in this case, both parties submitted supplemental briefs concerning the legislative history of the term "proceedings" in Section 804(b) of the Act. The committee reports do not elucidate Congress's intent in using this term. Both parties cite the Congressional Record statements of Senator Leahy, one of the sponsors of the legislation. Senator Leahy stated:

> [Section 804] is intended to lengthen any statute of limitations under federal securities law, and to shorten none. The section, by its plain terms, applies to any and all cases filed after the effective date of the Act, regardless of when the underlying conduct occurred .... [Section 804] applies to all private securities fraud actions for which private causes of actions are permitted and applies to any case filed after the date of enactment, no matter when the conduct occurred.

148 Cong. Rec. S7418, S7419–420 (July 26, 2002). Although both parties argue that these passages resolve the issue in their favor, the statements are simply too ambiguous to provide meaningful support for either side.

Legal precedent on the issue is scant. *Friedman v. Rayovac Corp.,* 295 F.Supp.2d 957 (W.D.Wis.2003) involved a consolidated class action in which all the underlying cases had been filed before July 30, 2002, but plaintiffs amended the complaint in January 2003 to add a new defendant. *Id.* at 975. The court held that the amendment initiated a new "proceeding" for the purposes of applying the extended statute of limitations under Sarbanes–Oxley. *Id.* at 975–76. It reasoned that if the plaintiffs had filed a new separate action against the defendants after July 2002, rather than amending the complaint, "there could be no dispute over the application of the new statute of limita-

tions." *Id.* at 976. Thus, "[i]t would make little sense to create a rule encouraging judicial inefficiency by requiring separate lawsuits for claims against different defendants arising out of the same conduct." *Id.*

The court in *In re Enron Corp. Securities, Derivative & ERISA Litigation,* docket no. H–01–3624, 2004 WL 405886 (S.D.Tex. Feb. 25, 2004) rejected the *Friedman* court's reasoning on similar facts. The plaintiffs in the case filed a complaint before July 30, 2002, and then filed an amended complaint on May 14, 2003, adding new defendants. *Id.* at *10. The court held that "because the latest complaint is technically an amendment of the previous consolidated complaint, relating to matters that occurred prior to the filing of the previous consolidated pleading," it is not a "new proceeding" governed by the lengthened statute of limitations. *Id.* at *13. The court reasoned that

> [t]o permit a plaintiff to file a new second suit or a new claim or add a new party in order to circumvent a statute of limitations and expand his legal rights, especially where the clear language of the statute expresses Congress' intent not to permit such expansion, as here, would create legal chaos.

*Id.* at *16 n. 42. The court in *Enron* relied on *Gerber v. MTC Electronic Technologies Co., Ltd.,* 329 F.3d 297 (2d Cir.2003), a decision considering a similar issue in the context of the Private Securities Litigation Reform Act (PSLRA), 15 U.S.C. § 78u–4(b). Certain provisions of the PSLRA did "not affect or apply to any private action ... commenced before or pending" on December 22, 1995. 109 Stat. 737, 758 (1995). In *Gerber,* the original complaint was filed in January 1995, and an amendment adding new plaintiffs was filed after December 1995. *Gerber,* 329 F.3d at 300–01. The *Gerber* court noted that the statu-

tory language referred to "actions" rather than "claims," and held that because the amendment did not create a new "action," the PSLRA provisions did not apply to the new plaintiffs. *Id.* at 309–10. It stated:

> In the absence of any indication to the contrary, we doubt that Congress intended that courts would apply different sets of substantive and procedural rules to groups of plaintiffs asserting identical claims in a single action, depending on when those plaintiffs were added to the complaint.

*Id.* at 310.

A more recent decision discussing the issue, *In re Dynegy, Inc. Securities Litigation,* 339 F.Supp.2d 804 (S.D.Tex.2004), involved a consolidated class action in which the underlying cases were filed before July 30, 2002, and the complaint was amended to add a new defendant after that date. *Id.* at 888. The Court adopted the reasoning in *Enron,* citing the *Gerber* decision, and rejected the *Friedman* court's approach. *Id.* at 888–89.

■■ It is notable, though not decisive, that unlike any of the cases above, this case involves the filing of a new complaint, rather than the amendment of an existing complaint.[4] Moreover, the logic of the *Gerber* case is not entirely applicable here, in part because it involved the addition of new plaintiffs rather than new defendants, and in part because the PSLRA provision includes the word "action," as specifically emphasized by the *Gerber* court, while Sarbanes–Oxley includes the somewhat more ambiguous term "proceeding." While the issue is a close one, given the remedial nature of Sarbanes–Oxley, this Court concludes that the August 2003 com-

plaint against a new defendant constitutes a new "proceeding" within the meaning of Section 804(b), and that the longer statute of limitations period provided by Sarbanes–Oxley applies.

### C. *Retroactivity*

■■ Plaintiffs argue that the extended two-year/five-year limitations period under Sarbanes–Oxley applies retroactively to revive claims that were barred at the time of its passage. Generally, "congressional enactments ... will not be construed to have retroactive effect unless their language requires this result." *Landgraf v. USI Film Prods.,* 511 U.S. 244, 264 (1994) (quoting *Bowen v. Georgetown Univ. Hosp.,* 488 U.S. 204, 208, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988)). Moreover, the weight of the caselaw argues strongly against plaintiffs' interpretation. *See, e.g., Foss v. Bear, Stearns & Co., Inc.,* 394 F.3d 540, 542 (7th Cir.2005)(holding that Sarbanes–Oxley does not revive time-barred claims); *In re Enter. Mortgage Acceptance Co., LLC, Sec. Lit.,* 391 F.3d 401, 406–10 (2d Cir.2004) (same); *Swack v. Credit Suisse First Boston,* docket no. 02–11943, 2004 WL 2203482, at \*5 n. 10 (D.Mass. Sept. 21, 2004) (stating same in dicta); *In re ADC Telecomm., Inc. Sec. Litig.,* 331 F.Supp.2d 799, 804 (D.Minn. 2004) (holding same); *Enron,* 2004 WL 405886 at \*17 (same); *Glaser v. Enzo Biochem, Inc.,* 303 F.Supp.2d 724, 734 (E.D.Va.2003) (same); *In re Heritage Bond Litig.,* 289 F.Supp.2d 1132, 1148 (C.D.Cal.2003) (same). *But see Roberts v. Dean Witter Reynolds, Inc.,* docket no. 8:02–CV–2115–T–26EAJ, 2003 WL 1936116, at \*2–\*4 (M.D.Fla. Mar. 31, 2003)

---

4. Defendants cite to *James v. AT & T Corp.,* 334 F.Supp.2d 410 (S.D.N.Y.2004), in which the court dismissed a complaint filed after July 30, 2002 that was essentially identical to a complaint filed before that date, where the duplicative filing was specifically intended to take advantage of the Sarbanes–Oxley limitations period. *Id.* at 411–13. As the complaint in this case is not simply a duplicate of the pending L & H action, *James* is inapposite here.

(examining legislative history referring to victims of Enron debacle and finding "intent to retroactively apply the statute of limitations"). This Court agrees with the overwhelming majority of courts, which have found that Sarbanes–Oxley did not revive time-barred claims.

### D. *When Did the Repose Period Begin?*

Plaintiffs argue that L & H's issuance of false financial statements, the last of which was issued on June 30, 2000, constituted the violation of Section 10(b) and Rule 10b–5 that triggered the repose period in this case. (*See* Pl.'s Mem. in Opp. at 7.) Under this interpretation, plaintiffs' claims were not extinguished before Sarbanes–Oxley was passed, and under the five-year Sarbanes–Oxley repose period, their claims are not time-barred. Defendant suggests, however, that the trigger of the repose period must be the defendant's own act, not L & H's, and that all of Artesia's complained of conduct took place prior to July 30, 1999. *See Beard v. J.I. Case Co.*, 823 F.2d 1095, 1097 n. 1 (7th Cir.1987) ("A period of limitation bars an action if the plaintiff does not file suit within a set period of time from the date on which the cause of action accrued. In contrast, a period of repose bars a suit a fixed number of years after an action by the defendant. . . .") Under this reading, defendant argues that the *Lampf* three-year repose period extinguished any potential claim prior to July 30, 2002, when Sarbanes–Oxley was passed.[5]

Most courts have held that the statute of limitations for Section 10(b) claims begins to run when the alleged misrepresentation is made. *See, e.g., Cont'l Bank, Nat'l Ass'n v. Vill. of Ludlow*, 777 F.Supp. 92, 102 (D.Mass.1991) ("[T]he repose period begins when the last alleged misrepresentation was made by any of the Participants."); *Waldock ex rel. John H. Waldock Trust v. M.J. Select Global, Ltd.*, 2004 WL 2278549 at \*4 (N.D.Ill. Oct. 7, 2004) ("The Court agrees with the reasoning of those cases holding that the statute of repose is triggered for a Section 10(b) and Rule 10b–5 violation when the defendant makes the misrepresentation or omission in connection with the sale or purchase of a security to a particular plaintiff."); *Bovee v. Coopers & Lybrand*, 216 F.R.D. 596, 604 (S.D.Ohio 2003) ("[T]he statute of limitations is triggered by the misrepresentation that constitutes the securities violation.").

However, none of these courts was faced with misrepresentations made by someone other than a named defendant as part of a deceptive scheme in which the defendant substantially participated. This Court previously held that Section 10(b) and Rule 10b–5

> impose primary liability on any person who substantially participates in a manipulative or deceptive scheme by directly or indirectly employing a manipulative or deceptive device (like the creation or financing of a sham entity) intended to mislead investors, even if a material misstatement by another person creates the nexus between the scheme and the securities market.

*In re Lernout & Hauspie*, 236 F.Supp.2d at 173. Neither this Court nor any other court has had occasion to address how a statute of limitations or period of repose is applied to a fraudulent scheme such as the one alleged in this case.

Defendant argues that plaintiffs are trying to have it both ways—arguing that Artesia's acts show that it is a pri-

---

**5.** At the hearing, plaintiffs argued that even if the Court measures the period of repose based on the acts of the defendant, the last act committed by Artesia was the extension of the loan in October 1999, and therefore the Lampf three-year period had not ended by June 2002. The Court need not consider this argument, based on the ruling below.

mary violator of Rule 10b–5 but relying on the subsequent disclosures by L & H to avoid the period of repose that relates to those very acts. No contradiction is inherent in this position, however. Plaintiffs have alleged a primary violation of Rule 10b–5 by defendant through its participation in a manipulative or deceptive scheme intended to mislead investors. Integral to the violation of Rule 10b–5 through this fraudulent scheme is the fraudulent misrepresentation by L & H, improperly recognizing revenue. Under Section 10(b), the statute of repose runs from the date of the last fraudulent misrepresentation, and the unique role of the defendant in this particular scheme does not affect this rule. Thus, the period of repose in this case was triggered on June 30, 2000, the date of L & H's last allegedly false financial statement.

Next, defendant argues that even if L & H's financial disclosures are the appropriate trigger for the repose period, only those claims by Artesia that allege effects on L & H's June 2000 financial statement are valid, because all previous financial statements occurred before June 30, 1999, and claims based on them are thus time-barred. Defendant argues that none of plaintiffs' claims in this action include such allegations, with the exception of Artesia's loan to the L & H principals in June 1999.

All of plaintiffs' claims involve allegations of improper revenue recognition by L & H in 1998 or 1999. Plaintiffs state that L & H's June 30, 2000 public filing necessarily reflected L & H's financial results for both 1998 and 1999. At the motion to dismiss stage, this provides a sufficient nexus between the alleged actions of Artesia and L & H's June 2000 financial statement. Accordingly, the statute of repose does not bar this action.

### E. Plaintiffs' Motion to Strike Articles Submitted by Defendant

Plaintiffs have moved to strike exhibits submitted by defendant consisting of news articles reporting on Artesia's relationship with L & H, which were not submitted with or referenced in the complaint. "Under Rule 12(b), 'any consideration of documents not attached to the complaint, or not expressly incorporated therein, is forbidden, unless the proceeding is properly converted into one for summary judgment under [Fed.R.Civ.P.] 56.'" *Cooperativa de Ahorro y Credito Aguada v. Kidder, Peabody & Co.*, 993 F.2d 269, 272 (1st Cir.1993) (quoting *Watterson v. Page*, 987 F.2d 1, 3 (1st Cir.1993)). *See Cooperativa*, 993 F.2d at 272–73 (holding that district court erred in *sua sponte* relying extensively on newspaper articles "in reaching its conclusions as to when the statute of limitations began to run"). However, narrow exceptions to this rule exist "for documents the authenticity of which are not disputed by the parties; for official public records; for documents central to plaintiffs' claim; or for documents sufficiently referred to in the complaint." *Watterson*, 987 F.2d at 3 (citations omitted).

In the complaint, plaintiffs stated that their allegations were based on a thorough investigation of all "reasonably available sources of information" including articles in print and electronic media. (§ 21.) They also alleged that the first suggestion that Artesia was involved in the fraudulent L & H scheme appeared in a June 24, 2003 article in the Belgian press. (§ 23.) Defendant argues that these statements essentially incorporate by reference the articles submitted by defendant, as those articles were published in the Belgian press before June 24, 2003, and suggest criminal conduct by Artesia in connection with L & H.

■ Precedent in this Circuit suggests, however, that a stronger connection between the submitted articles and the complaint is necessary before such extraneous material may be considered on a motion to dismiss. *See, e.g., Young v. Lepone,* 305 F.3d 1, 11 (1st Cir.2002)(allowing consideration of documents submitted by defendant on motion to dismiss where the "complaint contained extensive excerpts from, and references to" the documents and "the factual allegations of [the] complaint revolve around" the documents); *Beddall v. State Street Bank & Trust Co.,* 137 F.3d 12, 16–17 (1st Cir.1998) (allowing consideration of trust agreement submitted by defendant on motion to dismiss where complaint discussed agreement "at considerable length," complaint's "factual allegations [were] expressly linked to—and admittedly dependent upon" agreement, and plaintiff did not move to strike agreement from record); *Romani v. Shearson Lehman Hutton,* 929 F.2d 875, 879 n. 3 (1st Cir.1991) *superceded by statute on other grounds* (holding that where complaint alleged misrepresentations in offering materials, defendant's attachment of those offering materials to motion to dismiss was proper); *Fudge v. Penthouse Int'l, Ltd.,* 840 F.2d 1012, 1015 (1st Cir.1988)(allowing consideration of article submitted by defendants on motion to dismiss where article was "not merely referred to in plaintiffs' complaint but was absolutely central to it" and plaintiffs "unquestionably would have had to offer a copy of the article in order to prove their case"); *Schaffer v. Timberland Co.,* 924 F.Supp. 1298, 1305–06 (D.N.H.1996) (noting that while in recent years some federal courts have adopted a flexible approach to consideration of extrinsic documents on a motion to dismiss, "the First Circuit continues to adhere to the traditional view" that such consideration is ordinarily forbidden without conversion to summary judgment).

In this case, plaintiffs did not refer to the relevant articles in their complaint, nor were the articles somehow central to the allegations in the complaint. The more tenuous connection between the articles and the complaint in this case is not sufficient to allow their consideration at this stage. Therefore, plaintiffs' motion to strike is allowed.

### F. *Inquiry Notice*

Defendant argues that even under the Sarbanes–Oxley regime, plaintiffs' claims are untimely because plaintiffs were on inquiry notice of their claims more than two years before they filed suit.

■ The statute of limitations does not begin to run until "the time when plaintiff in the exercise of reasonable diligence discovered or should have discovered the fraud of which he complains." *Cooperativa de Ahorro y Credito Aguada v. Kidder, Peabody & Co.,* 129 F.3d 222, 224 (1st Cir.1997) (citations and internal quotation marks omitted). The First Circuit has developed a two-step procedure to apply this analytic framework to the facts of specific cases. The first is to determine the time when "storm warnings" were evident that would put a reasonable investor on notice of a possible fraud. *See Young,* 305 F.3d at 8. Once the timing of such warning signs is established, the second step is to determine whether after the signs emerged a plaintiff was reasonably diligent in investigating them. *See id.* "[F]ollowing the receipt of sufficient storm warnings, a plaintiff's cause of action is deemed to accrue on the date when, exercising reasonable diligence, she would have unearthed the fraud." *Id.* at 10.

This Court previously found with respect to the L & H fraud that "throughout the fall of 2000 and into the spring of 2001 there were more than 'storm warning[s]' afoot—the winds were howling, the rains

were pouring, and reasonably prudent investors were battening down the hatches to preserve their legal rights." *Bamberg,* 236 F.Supp.2d at 85 (describing unraveling of fraud at L & H). These same warnings were sufficient to put plaintiffs on inquiry notice of a potential claim against Dexia. Thus, the critical inquiry is whether plaintiffs were reasonably diligent in investigating potential claims against this defendant once those storm warnings appeared.

▉ "[O]nce the defendant has shown the presence of storm warnings, the plaintiff must 'counter with a showing that she fulfilled her corresponding duty of making a reasonably diligent inquiry into the possibility of fraudulent activity.'" *Id.* (quoting *Young,* 305 F.3d at 9). "It is plaintiff's burden to show compliance with the statute of limitations. The exercise of reasonable diligence is determined by examining 'the nature of the misleading statements alleged, the opportunity to discover the misleading nature of the statements, and the subsequent actions of the parties.'" *Slavin v. Morgan Stanley & Co., Inc.,* 791 F.Supp. 327, 331 (D.Mass.1992) (quoting *Cook v. Avien, Inc.,* 573 F.2d 685, 696–97 (1st Cir.1978)). In short, the plaintiff must allege "facts which could lead to an inference of reasonable diligence." *Slavin,* 791 F.Supp. at 331.

"Inquiry notice is triggered by evidence of the possibility of fraud, not full exposition of the scam itself." *Kennedy v. Josephthal & Co., Inc.,* 814 F.2d 798, 802 (1st Cir.1987) (citations omitted). However, courts have recognized that uncovering evidence of actionable fraud may take a long time. The First Circuit has noted that "a reasonably diligent investigation following the receipt of storm warnings may consume as little as a few days or as much as a few years to get to the bottom of the matter." *Young,* 305 F.3d at 9. Whether a plaintiff is on inquiry notice and whether she exercised reasonable diligence

are often factual questions. The First Circuit has stated:

> In the archetypical case ... it is for the factfinder to determine whether a particular collection of data was sufficiently aposematic to place an investor on inquiry notice. So too the related question of whether a particular plaintiff exercised reasonable diligence in the face of such warnings.

*Id.* (citations omitted); *see also Marks v. CDW Computer Centers, Inc.,* 122 F.3d 363, 367 (7th Cir.1997) ("Whether a plaintiff had sufficient facts to place him on inquiry notice of a claim for securities fraud under S.E.C. Rule 10b–5 is a question of fact, and as such is often inappropriate for resolution on a motion to dismiss under Rule 12(b)(6)."); *In re Global Crossing, Ltd. Sec. Litig.,* 313 F.Supp.2d 189, 199 (S.D.N.Y.2003) ("The question of whether a plaintiff exercised due diligence is usually a question of fact for the jury to decide.... A fortiori, caution is warranted in approaching a motion for judgment on the pleadings on such issues.") (citations and quotation marks omitted).

In considering whether the plaintiffs exercised due diligence in investigating storm warnings, this case presents a particularly complex problem because the defendant is alleged to have participated in a scheme orchestrated by others. In *Levitt v. Bear Stearns & Co., Inc.,* 340 F.3d 94 (2d Cir.2003), the Second Circuit faced a similar case under Section 10(b), involving a defendant, Bear Stearns, that allegedly acted as a "clearing agency" for Sterling Foster, which was alleged to have improperly manipulated the market. *Id.* at 96–97. The *Levitt* court noted that in *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,* 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994), the Supreme Court established stringent requirements for demonstrating a primary

Section 10(b) violation, and that under this standard, "once Plaintiffs were on inquiry notice that they had been defrauded, they were required to exercise reasonable diligence in discovering the facts establishing Bear Stearns' knowing participation in Sterling Foster's fraudulent scheme before filing suit." *Levitt*, 340 F.3d at 103. The court determined that the factual issues inherent in such an analysis could not be resolved on the motion to dismiss record. *Id.* On this basis among others, the court vacated the district court's dismissal of the suit, stating that "there are factual disputes concerning the scope of the inquiry conducted by Plaintiffs and the question of whether a reasonable inquiry could have revealed enough information to satisfy the pleading requirements for § 10(b) primary violator liability." *Id.* at 104.

■ Similar considerations apply here. Plaintiffs allege that they made substantial efforts to investigate their claims, and that they uncovered no evidence demonstrating that the defendant was an active participant in the L & H fraud until June 2003. (Complaint at ¶¶ 21, 23.) They state that they analyzed "all reasonably available sources of information," including L & H filings and press releases for the relevant years, articles and reports in print and electronic media, documents produced by L & H to the SEC, and interviews of various relevant individuals. (Complaint at ¶ 21.) Drawing all inferences in plaintiffs' favor, it cannot be said as a matter of law, on the current record, that plaintiffs failed to exercise reasonable diligence in pursuing their claim against Dexia. Thus, the Court denies the motion to dismiss until a more ample record is developed.

### G. *Primary Liability*

Defendant argues that plaintiffs' allegations against Dexia at most amount to a claim for aiding and abetting, and are therefore barred by *Central Bank. See*

*Central Bank,* 511 U.S. at 191, 114 S.Ct. 1439 (holding that "a private plaintiff may not maintain an aiding and abetting suit under § 10(b).") However, the *Central Bank* Court did not conclude that secondary actors such as lawyers, accountants, banks, and underwriters were always shielded from primary liability. The Court stated:

The absence of § 10(b) aiding and abetting liability does not mean that secondary actors in the securities markets are always free from liability under the securities Acts. Any person or entity, including a lawyer, accountant, or bank, who employs a manipulative device or makes a material misstatement (or omission) on which a purchaser or seller of securities relies may be liable as a primary violator under 10b–5, assuming *all* of the requirements for primary liability under Rule 10b–5 are met. In any complex securities fraud, moreover, there are likely to be multiple violators....

*Id.* (internal citation omitted).

As discussed above, this Court has held that primary liability under Section 10(b) and Rule 10b–5 may in some cases be found where a person "substantially participates in a manipulative or deceptive scheme ... even if a material misstatement by another person creates the nexus between the scheme and the securities market." *Lernout,* 236 F.Supp.2d at 173. In that case, this Court found that plaintiffs' allegations that defendants FLV and Mercator set up, funded, and operated sham entities designed to enter into fraudulent licensing agreements with L & H in order to artificially inflate L & H's profits provided a strong inference of scienter and satisfied the requirements for liability under Section 10(b). *Id.* at 174–76. The Court also noted that plaintiffs demonstrated reliance on the manipulative or deceptive device "by alleging facts suffi-

cient to show (1) that defendants substantially participated in a fraudulent scheme; and (2) when the scheme is viewed as a whole, the plaintiffs relied on it." *Id.* at 174.

In this case, plaintiffs have alleged that Artesia (a) helped to finance the sham LDCs (¶¶ 7–8, 87); (b) loaned money to the nominal owner of certain LDCs with the knowledge that the LDCs would use those funds to engage in transactions that would allow L & H to book fictitious revenue from "licensing fees" (¶¶ 7, 95, 97–117); (c) intentionally structured the loans artificially to inflate L & H's revenue in a manner designed to conceal the fact that those loans were guaranteed by L & H's principal officers (¶¶ 7, 96, 106, 110, 113, 118); (d) acted with the specific purpose of hiding the guarantees provided by L & H's officers from the SEC and investors (¶¶ 96, 106, 110, 113, 118); (e) took affirmative steps to conceal its role in the L & H fraud from the company's Audit Committee investigators (¶¶ 127–128); and (f) extended a $20 million line of credit to L & H's principal officers with full knowledge that those funds would be utilized to record fictitious revenue supposedly generated from licensing transactions with LDCs. (¶ 114). *See also* Pl.'s Surreply Br. at 12–13. These allegations, taken as a whole, are sufficient to satisfy the Section 10(b) standard for primary liability, as described by this Court in *Lernout,* 236 F.Supp.2d at 173–74.[6]

The Court declines defendant's invitation to reconsider its holding in *Lernout* in light of limited subsequent district court caselaw. *See In re Homestore.com Inc. Sec. Litig.,* 252 F.Supp.2d 1018, 1041 (C.D.Cal.2003)(holding that because plaintiffs relied on material statements and omissions and not on the "scheme" itself, participants in the scheme who did not make the statements and omissions were not primarily liable under Section 10(b)). *But see In re Enron Corp. Sec., Derivative, & ERISA Litig.,* 235 F.Supp.2d 549, 577 (S.D.Tex.2002) (holding that subsection (a) and (c) of Rule 10b–5 "allow suit against defendants who, with scienter, participated in a course of business or a device, scheme or artifice that operated as a fraud on sellers or purchasers of stock even if these defendants did not make a materially false or misleading statement or omission")(internal citations and quotation marks omitted).

In addition, the Court does not find persuasive defendant's argument that the alleged conduct in this case amounts to commonplace business transactions in which Artesia was a conventional lender. (*See* Def.'s Br. at 15.) On the contrary, plaintiffs allege that defendant's actions were integral to the fraudulent scheme, and that defendant was a primary architect of the scheme to finance the sham entities. Therefore, plaintiffs have alleged facts sufficient to establish primary liability by defendant under Section 10(b).

## IV. ORDER

Dexia's Motion to Dismiss (Docket No. 30) is **DENIED**. Plaintiffs' Motion to Strike Exhibits C Through M to the Declaration of Breton Leone–Quick (Docket No. 39) is **ALLOWED**.

---

**6.** Plaintiffs' allegation that Artesia extended the Senior Officers a $20 million line of credit is not in itself sufficient to demonstrate primary liability under Section 10(b), as this would constitute aiding and abetting activity under *Central Bank.* However, plaintiffs have alleged a much more extensive pattern of activity by defendant in this case.